## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____ )
                            )
ARIEL AYANNA,               )
            Plaintiff       )
                            )
v.                          )        Civil Action No.
                            )
DECHERT LLP                 )
            Defendant.       )
_____ )

## COMPLAINTAND JURY DEMAND

## <u>INTRODUCTION</u>

The Plaintiff, Ariel Ayanna ("Ayanna"), is a male attorney, who worked as an associate

for the Defendant, Dechert, LLP ("Dechert") in Dechert's Boston office from September 11,

2006 until his unlawful termination on December 17, 2008.  Ayanna is married with two young

children, the first child, his son Henry, was two years old when he became an associate at

Dechert.  His wife suffers from mental illnesses which are chronic and episodic and impair her

ability to care for herself and their children.  At times, her mental illnesses can incapacitate her.

During Ayanna's first year, he was evaluated positively and received a bonus.  During his second

year of employment at Dechert, Ayanna's wife became pregnant which coincided with a

worsening of her condition.  Her condition deteriorated to the point that she attempted suicide.

Ayanna was an equal co-parent of his children before his wife's suicide attempt.  After it, he

became the primary caretaker of their children and had to care for her, assuming a traditionally

"female" role.

Due to the birth of his second child and his wife's deteriorating condition, he took leave

to care for his wife and children.  Ayanna used both Dechert's four weeks of paid paternity leave

1

and his federal entitlement under the Family and Medical Leave Act ("FMLA").   Dechert's firm culture equates masculinity with relegating caretaking to women and working long hours in the office.   During Ayanna's employment, male attorneys did not take either the entire amount of paternity leave offered or extend leave into the FMLA entitlement.  By taking additional leave beyond the paternity leave offered by Dechert, Ayanna did not conform to Dechert's firm culture for males.

Dechert knew of Ayanna's wife's mental illness, his need to care for both her and his two children, and that he assumed the primary caretaking role for his children.  Ayanna was derided for doing so, by both partners and associates, and was criticized for lack of commitment to Dechert based on his family obligations despite the fact that they never interfered with the requirements of being an associate at Dechert.  After finding out about his wife's mental illness, Dechert began to discriminate against Ayanna because of his wife's mental illness by withholding work from Ayanna.  When he returned from his paternity and FMLA leave, Dechert continued retaliating against him both by withholding work and by falsely and negatively evaluating his performance based upon a false perception that his "personal needs" detracted from his work.  He was terminated four months after his return from FMLA leave.

Ayanna contends that Dechert terminated him because he refused to assume a stereotypically "male" role in connection with his children; because of his association with his wife who has a mental illness; and in retaliation for his taking leave under the FMLA.  Ayanna brings this action for unlawful sex discrimination in violation of state and federal law, unlawful retaliation for having exercised his rights under the FMLA, and violation of the association provision of the Americans with Disabilities Act ("ADA"). He seeks lost wages and benefits,

emotional distress damages, punitive damages, attorneys' fees, and costs, all as provided for by law.

## PARTIES

1.      The Plaintiff, Ayanna, is an individual residing in Somerville, Middlesex County, Massachusetts.  At all relevant times to this complaint, Ayanna was an associate attorney in Dechert's Boston office, making him an employee as defined by the FMLA, Chapter 151B, the ADA, and Title VII at all relevant times to this complaint.

2.      The Defendant, Dechert, is a limited liability partnership formed and registered in Pennsylvania which does business in Boston, Suffolk County, Massachusetts at 200 Clarendon Street, 27th Floor.  Dechert is an employer as defined under Chapter 151B, Title VII, the ADA, and the FMLA.  At all relevant times to this complaint, Dechert controlled the terms and conditions of Ayanna's employment.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the FMLA, ADA, and Title VII claims pursuant to 29 U.S.C. §2617 (29 CFR Part 825.400(a) (2)), 42 U.S.C. § 12117, 42 U.S.C. § 2000e-5.

4.      The supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 over the M.G.L. c. 151B claims which are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the Constitution of the United States of America.

5.      Personal jurisdiction and venue are appropriate pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391 since the Defendants are residents of, have an agent or agents, and/or transact their affairs in Boston, Suffolk County, Massachusetts, and the unlawful conduct complained of occurred in this District.

**<u>FACTS</u>**

6.      Ayanna began working at Dechert on September 11, 2006 after graduating *magna cum laude* from Boston University School of Law.  He was hired as an associate into Dechert's Financial Services Group ("FSG") and worked out of the Boston office.

7.      Although he worked out of the Boston office, Ayanna worked with FSG partners, counsel, and associates in Dechert's offices worldwide, including: Boston; Hartford; New York; Philadelphia; Washington, D.C.; Newport Beach, California; London; Brussels; Luxembourg; Munich; and Hong Kong. Over the course of his employment, Ayanna worked with Dechert clients and outside counsel across North and South America, Europe, the Middle East, and Asia.

8.      The national and international client demands necessitate that the attorneys be available at "off" hours because of the time differences even when there are no impending deadlines.  Partners and associates in the FSG regularly worked outside the office, taking calls and emails from clients at home.

9.      During the periods that Ayanna did work assigned by each individual partner, each partner had supervisory authority over Ayanna and had control over the terms and conditions of Ayanna's employment.

10.     Ayanna, who was provided a Blackberry by Dechert, was always available for clients, partners, and senior associates no matter where he was located physically.  All the partners, associates, and clients Ayanna worked with knew this.

11.     The culture for men at Dechert is a "macho" one which praises and encourages male associates and partners to fulfill the stereotypical male role of ceding family responsibilities to women.  In this culture, caregiving is for wives of male attorneys and

tolerated only for female attorneys.  The firm culture does not require female attorneys to conform to the "macho" stereotype.

12.     For example, two of the top and most senior associates in Ayanna's group, both of whom later became partners, Julien Bourgeois ("Bourgeois") and Tom Bogle ("Bogle"), regularly bragged about how little time they spent on family obligations.

13.     Ayanna's wife suffers from Borderline Personality Disorder, long-term Post-Traumatic Stress Disorder, Major Depressive Disorder, and General Anxiety Disorder.  Her mental illnesses are chronic, long term, and episodic.  They impair her ability to care for herself (for example, during some episodes, she forgets to do basic life sustaining activities like eating), to care for the children, to cook, to clean, and to remember.  During serious episodes, she cannot function at all. Her condition will never completely resolve and is only partially controlled with medication.

14.     Her condition is a serious health condition covered by the FMLA and makes her an individual with a disability covered by the ADA.

15.     When he began his employment at Dechert, Ayanna was an equal co-parent both because he rejects the "macho" stereotype and because his wife has a mental illness which precludes her taking on the caretaker role exclusively.  He advocated for more equitable treatment of attorneys who are caregivers.  Ayanna did not fulfill the Dechert male stereotype.

16.     Ayanna's failure to fulfill the role for male parents accepted at Dechert and his support of attorneys who were caregivers flew around the rumor mill at Dechert.

17.     Ayanna's colleagues, both partners and associates, knew about Ayanna's role as an equal co-parent and that he did not fulfill the "macho" stereotype.

18.     Even those male colleagues to whom he had never spoken about these issues directly and

who worked outside of Boston, such as Bourgeois and Bogle, knew. For example, at a

dinner with senior and junior associates in February, 2007, Ayanna was asked what he

would change about the firm if he could.  Before Ayanna actually responded, Bourgeois

jumped in and put Ayanna down in front of the group by sarcastically saying that Ayanna

would complain about family/work balance.  He and Bogle proceeded to boast about who

worked more while ignoring family obligations, particularly which had left his wife alone

with family responsibilities while she was sick, as though it were a badge of honor.

19.     As Bourgeois and Bogle, two of the top associates in the FSG, illustrated with their own

behavior and with how they put Ayanna down for not joining them in it, Ayanna was

clearly supposed to emulate them and not take on a traditional "female" role regarding

family responsibilities.

20.     Because of his advocacy for caretakers and his refusal to adopt the stereotypical role for

men at Dechert, Ayanna's fellow associates and partners made false assumptions about

his abilities and evaluated certain aspects of his performance negatively because of those

false assumptions.

21.     In January, 2007, Ayanna received an assignment from a senior associate, Stephen

McShea ("McShea").  At one point during the assignment, after 7:00 p.m., Ayanna

notified McShea that he was leaving to have dinner with his family and would complete

the assignment at home by the end of the night.  The assignment had to be done by a

10:00 a.m. conference call the next day.  McShea rolled his eyes, was obviously

displeased, and expressed his displeasure with a sarcastic comment.

22.     When at home, Ayanna was available at all times by phone, Blackberry, and email to do
        substantive work, and McShea knew this.  McShea neither called nor emailed Ayanna
        that night.

23.     Ayanna completed the assignment by the end of the night.  McShea called Ayanna's
        work excellent and "better than what [he] would have done [him]self."  Nevertheless,
        McShea complained to senior attorneys that Ayanna left "early."

24.     In late June, 2007, Ayanna left work at approximately 9:00 p.m. after completing his
        portion of a project he was working on with partner Anthony Zacharski ("Zacharski").

25.     There was no reason for Ayanna to stay that night as Zacharski had not directed Ayanna
        to stay nor was there any other reason.  Ayanna's legal work on the project was evaluated
        positively in his review.  Zacharski immediately assumed Ayanna had a "conflicting"
        family obligation and chastised him the following day for leaving.  Ayanna had no
        conflicting family obligation.  Zacharski was responding to the reputation Ayanna had in
        the firm as a man who adopted a traditionally "female" role.

26.     As the project continued, Ayanna worked long days, all seven days of the week, and over
        the July 4th weekend.

27.     The incidents detailed above make it clear that male attorneys at Dechert are not expected
        to take on "female" roles in their families and have false and negative assumptions made
        about them and their performance if they do not conform to the gender stereotype that
        men leave caretaking to women.

28.     Ayanna was treated differently from female caregivers.  In general, women who were in
        the FSG and who had childcare obligations were allowed and expected to leave or
        rearrange their schedules to attend to these obligations, to work from home, and to return

7

to work later in the evening.  They were not derided or falsely criticized when they took

care of their family responsibilities, demonstrating that Dechert intends that only women

were to fulfill this role and discriminates against men who take a traditionally "female"

caretaking role.

29.     In September, 2007, Ayanna went to work in Dechert's Munich, Germany office.

Ayanna sought the temporary transfer so that he could be with his wife while she

conducted research in Germany on a Fulbright Graduate Fellowship.  Ayanna stayed in

Munich for nine months, until June, 2008.

30.     Before leaving for Munich, Ayanna spoke to Robert Helm ("Helm"), a partner in

Washington, D.C. who also headed the FSG nationally.  Helm told Ayanna that his hours

in Munich might be lower than they had been in Boston, but that Ayanna should not

worry about it.

31.     The hours Ayanna could bill did drop while he worked in Munich.  However, although he

billed fewer hours than he had been able to bill in the U.S. office, Ayanna billed

comparable hours to the attorneys in the Munich office.

32.     Ayanna continued to be concerned about the fewer hours he could bill.  In the fall of

2007 he sent an email about his hours to Mary Mehr ("Mehr"), Dechert's practice group

administrator. Mehr coordinates work assignments from the FSG partners to the FSG

associates.  Mehr told him that it often took three months to "ramp up" and that she

would take steps to obtain more work for him.

33.     Despite these representations from Mehr, Ayanna's workload did not increase. He was

concerned enough that he raised the issue again at his 2007 performance review on

February 11, 2008, which was held by teleconference with Angelo Lercara ("Lercara"),

then a national partner and later a partner in Dechert's Munich office, and John O'Hanlon ("O'Hanlon"), a partner in Dechert's Boston office.

34.   O'Hanlon reassured Ayanna again that the drop in hours was to be expected.

35.   Ayanna's 2006-2007 evaluation was positive.  His evaluators called him "dependable," complimenting him because he "put [] in extra time when necessary to meet deadlines" and "exceeded expectations in resolving legal issues."  His legal analytical skills and judgment, oral expression, written expression, and interpersonal skills were also praised.

36.   Ayanna received a $30,000 bonus for his work in 2007.

37.   When he did not get billable work, Ayanna worked on other important tasks for Dechert, including pro bono matters (an obligation the firm takes very seriously) and marketing pieces, such as articles and chapters for industry publications.

38.   Ayanna's wife became pregnant while they were in Munich.  After she became pregnant, Ayanna's wife's mental health condition deteriorated, making her increasingly dependent on Ayanna to care for her daily needs and could no longer equally share in the care of their son.  At that point, Ayanna became the primary caretaker of his son.

39.   On May 4, 2008, Ayanna's wife attempted suicide which resulted in an overnight hospital stay in a hospital in Munich.

40.   In May, 2008, shortly after his wife's suicide attempt, Ayanna asked Lercara if he could work from home. He explained in an email to Lercara that the reason he wanted to work from home involved his wife's health. Lercara said he would consult with the partners in the United States.

41.   After this email to Lercara, Ayanna ceased receiving legal work. Approximately one week later, Ayanna then applied to take leave under the FMLA.

9

42.     Ayanna notified Dechert that he would be taking leave under the FMLA to care for his wife.  He presented the FMLA forms to Lercara and the Dechert office manager in Munich, as well as to members of Dechert's Human Resources department.  In the forms, Ayanna explained that he required the leave to care for his wife because of her mental illness.  Attached to the forms was the hospital report which described her suicide attempt and hospitalization as a result.

43.     As a result of Ayanna's email to Lercara and his submission of the FMLA forms and the hospital reports, Dechert was informed that Ayanna wife had a mental illness and that he was required to care for her because of it.

44.     Ayanna's son Lyonel was born on July 7, 2008.  Ayanna's wife's mental illness required him to care for her and the child after the birth.

45.     Dechert offers paid leave for its associates who have children.  However, women receive a longer period of paid leave after having a child than men (who receive four weeks of paid leave).  Dechert's policy discourages men from taking on a primary caretaking role in child care.  This difference in paid leave is part of Dechert's culture in which men are not supposed to be the primary caretakers of children, leaving that to their wives.

46.     While Ayanna worked at Dechert, not one male attorney took the full twelve weeks of leave allowed under the FMLA.  The men who had children did not even take the full amount of paid paternity leave.

47.     For example, another male associate, Kenneth Earley, told Ayanna he was afraid to take leave beyond a few days when he had a child, concerned about negative repercussions.  Another attorney, Thomas Gierath, a national partner in the Munich office, took no time off when his child was born.

10

48.     Dechert was hostile to Ayanna's taking FMLA leave.  Mehr articulated this hostility
        when discussing Ayanna's FMLA leave with him shortly before he returned to the United
        States in June, 2008.  She referred to Ayanna's FMLA entitlement as "personal leave"
        that "we [Dechert] don't have to grant to you."

49.     Dechert also refused to advance Ayanna vacation time to cover his salary during his
        FMLA leave, although Dechert advances vacation time to associates for non-FMLA
        related purposes.

50.     Because of Dechert's hostility, Ayanna returned to work in the Boston office on August
        15, 2008, even though he had an additional four weeks left in his FMLA entitlement.
        However, Ayanna's leave still far surpassed the leave any male attorney at Dechert took
        and was clearly against the grain of the sexist and "macho" culture at Dechert.

51.     When he returned from FMLA leave, Dechert retaliated against him for having taken the
        leave by withholding work from Ayanna.

52.     Upon his return, Mehr told Ayanna that assignments from one partner, Christopher
        Christian ("Christian") would make up half his workload.  In fact, the overwhelming
        majority of Ayanna's work after he returned was for Christian.  He got almost no work
        from any other partners or senior associates, despite requesting it regularly.  The work
        from Christian, on its own, was not enough to fulfill Ayanna's billable hours requirement.

53.     Christian's wife is a full time, and the primary, caretaker for their child.  Christian fits the
        male stereotype sanctioned by the Dechert culture.  He is known for working long hours
        and taking no role in the care of his family.  Christian expressed hostility towards Ayanna
        after his return from FMLA leave.

54.    Ayanna's almost exclusive assignment to Christian was calculated to force him conform to the male culture sanctioned by Dechert.

55.    On September 30, 2008, Ayanna had to take his wife to the hospital because of a mental health breakdown.  He left work at approximately 7:00 p.m.  Her breakdown qualifies as a serious health condition covered by the FMLA.  The FMLA time Ayanna had left for 2008 should have covered any care Ayanna had to provide to his wife.

56.    The day after this incident Christian berated Ayanna over the course of two days for what he immediately assumed was a childcare issue. There was no basis for the reprimands as Ayanna's leaving at 7:00 p.m. had not caused a missed deadline or any damage to any client.

57.    Ayanna explained to Christian that he had to take his wife to the hospital because of her mental illness.

58.    After hearing this explanation, Christian substantially decreased the assignments he gave Ayanna, despite Ayanna being available and asking for work repeatedly.  As Ayanna had been working with Christian almost exclusively, Christian's withholding work decreased Ayanna's billable hours substantially.

59.    Christian made derisive comments about Ayanna's taking care of his wife and children throughout the fall of 2008, such as, "I hope you're not planning to leave at 5:30 today for any familial obligations," whether or not Ayanna had family obligations or planned to leave.  He did not make these derogatory comments about or to women who had family obligations.

60.    Christian's derision of Ayanna had no basis in fact as Ayanna regularly worked late at the office and even worked from home.

12

61.     Joseph R. Fleming, ("Fleming"), a partner in Dechert's Boston office, is the co-chair of
        the FSG and a member of the firm's policy committee, giving him control over the terms
        and conditions of Ayanna's employment.

62.     On October 20, 2008, Christian complained to Fleming about Ayanna's "tardiness"
        because Ayanna arrived at the office shortly after 9:00 a.m. after dropping his five year-
        old son off at school.  There is no requirement that associates arrive before 9:00 a.m., and
        often associates and partners arrived after 9:00 a.m. without criticism or adverse
        consequences.  Women with family responsibilities in the FSG regularly arrived late to
        work because of caring for their children without repercussion.

63.     Men who fit the Dechert culture, who were not primary caregivers or equal co-parents
        and who took less paternity leave than Ayanna arrived after 9:00 a.m. without negative
        consequences.

64.     After Christian's complaint, Fleming demanded that Ayanna "strongly consider coming
        in earlier generally" because "I know who comes in early and who doesn't."

65.     Christian also complained to Fleming that Ayanna was not "available" when needed.

66.     This complaint had no basis.  Ayanna's caregiving responsibilities never detracted from
        his fulfilling the requirements of his position at Dechert.  Ayanna regularly was at the
        office until 7:00, 8:00, 9:00 p.m. or even later, and he often worked late into the night
        from home.  He never missed a deadline and was never unavailable even if he was not
        physically in the office.

67.     Ayanna always took his laptop and Blackberry home with him, was available to take and
        work on assignments from home at any time, at all hours, and was available to come into

13

the office on the weekends.  However, Christian refused to contact Ayanna regarding
work assignments unless he was in the office.

68.     Christian's complaints continued throughout the fall of 2008.

69.     On December 17, 2008, in a meeting with Fleming, Geoff Kenyon ("Kenyon") (for
whom Ayanna had done no work), and O'Hanlon (who had praised Ayanna's work),
Fleming told Ayanna that despite his successful work in Munich and Christian's repeated
praise of Ayanna's work product in the fall of 2008, Ayanna had received a performance
evaluation of "fair"—a lower evaluation than the first evaluation he had before he took
FMLA leave.

70.     Ayanna received two pages of a summary of the comments from the review.  The
summary stated that he had been evaluated as "fair."

71.     During this meeting, Dechert, through Fleming, terminated Ayanna.  Fleming told
Ayanna that Dechert terminated him because of his performance: namely, Ayanna had
failed to meet the billable hour requirement and his "personal issues" interfered with his
meeting the employment requirements at Dechert.  Fleming gave Ayanna no other
reasons for his termination.

72.     The representation that Ayanna had been evaluated as "fair" is false.  Only one out of ten
evaluators rated Ayanna as "fair" overall which corresponded to 10% of the total
evaluation.

73.     The majority of reviews in the individual categories are "good" or "very good" and nine
out of ten of Ayanna's reviewers rated him as "good" or "very good" in the overall
evaluation.

74.     The review praised his work product and abilities, describing him as having "good
        analytical skills, good legal judgment, and has the ability to deliver very good written
        work product."

75.     There were some comments in the evaluation that Ayanna "lacks drive," "conveys a lack
        of commitment to his work," and "works on his own schedule."  All of these comments
        are obvious references to his FMLA leave and his taking on a traditional "female" role in
        his family obligations.

76.     Ayanna's dependability was also questioned in the performance evaluation, although he
        had been praised for his dependability in the review of his performance before he took
        FMLA leave.

77.      Fleming's explicit statement that Ayanna's "personal issues" warranted termination is a
        clear reference to Ayanna's failure to conform to the "macho" stereotype that men should
        not be engaged fathers at Dechert and constitutes sex discrimination.  Female associates
        at Dechert were not required to be disengaged parents.

78.     Dechert only claimed Ayanna's "personal issues" were a problem *after* he took FMLA
        leave, illustrating that this justification for Ayanna's termination was retaliation for his
        taking FMLA leave.

79.     Regarding Dechert's billable hours claim, Dechert reassured Ayanna while he was in
        Germany that he should not worry about billing fewer hours.  Before disclosing his
        wife's mental illness, Ayanna had billed comparable hours to the lawyers in Munich,
        even while spending more time than they did on important nonbillable matters.

80.     Ayanna's workload dropped substantially only after he reported his wife's mental illness
        to Lercara.   Therefore, the claim that Ayanna failed to meet his billable hours

requirement is pretext for association with his wife who has a mental illness or retaliation for having taken leave to which he was entitled under the FMLA to care for her.

81.     The significant drop in Ayanna's work in Munich after he reported his wife's condition to Lercara, Christian's animosity after learning of Ayanna's wife's mental disability, Dechert's displeasure at Ayanna's taking FMLA leave, and the firm's culture which did not approve of Ayanna's caretaker role demonstrate that the false "fair" evaluation and Ayanna's resulting termination based upon it are pretexts for discrimination based upon illegal sex stereotyping, association with a person with a disability, or retaliation for having taken FMLA leave.

82.     As a result of the Defendant's discriminatory and retaliatory conduct, Ayanna has incurred emotional distress, lost income and financial benefits, liquidated damages, and attorneys' fees and costs.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

83.     Ayanna properly exhausted his administrative remedies as required pursuant to 42 U.S.C. § 2000e-5 and M.G.L. c. 151B.

84.     Ayanna filed a Charge of Discrimination ("Charge") with the Massachusetts Commission Against Discrimination ("MCAD") on or about September 29, 2009, dually filed with the Equal Employment Opportunity Commission ("EEOC"), alleging the same discrimination and retaliation in violation of M.G.L. c. 151B that is the subject of this Complaint.

85.     On or about December 17, 2009, Ayanna noticed the MCAD of the removal of his claims to file a private right of action in civil court.  Contemporaneously, Ayanna noticed his intent to withdraw her claims from the EEOC.

16

## COUNT I

### RETALIATION FOR EXERCISING RIGHTS AFFORDED UNDER THE FMLA
### 29 U.S.C. § 2615(a) (2)

Dechert's conduct, as set forth above, constitutes violations of the FMLA, 29 U.S.C. § 2615(a) (2), and its attendant regulations.

## COUNT II

### VIOLATION OF M.G.L. c. 151B, § 4(1)

The actions of Dechert as set forth above constitute sex discrimination based upon disparate treatment and unlawful stereotyping in violation of M.G.L. c.151B § 4(1).

## COUNT III

### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. § 12112 (b) (4)

The actions of Dechert as set forth above constitute discrimination based upon association with a disabled individual, in violation of 42 U.S.C. § 12112 (b) (4).

## COUNT IV

### VIOLATION OF 42 U.S.C. §2000e—2 &3

The actions of Dechert as set forth above constitute sex discrimination based upon disparate treatment and unlawful stereotyping, in violation of Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991.

## COUNT V

### VIOLATION OF M.G.L. c. 151B, § 4(1)

The actions of Dechert as set forth above constitute discrimination based upon association with a disabled individual, in violation of M.G.L. c.151B § 4(1).

WHEREFORE, Ayanna requests that this Court award the following relief:

1.      Order Dechert to institute and carry out policies, practices, and programs that eradicate unlawful stereotyping of male care-givers.

2.      Order Dechert to pay Ayanna:

   a) Back pay;

   b) Front pay;

   c) Lost benefits;

   d) Emotional distress damages;

   e) Punitive damages;

   f) Attorneys' fees and costs as provided for by statute; and

   g) Any other relief to which Ayanna may be entitled.

## JURY DEMAND

Ayanna demands a trial by jury on all of his claims.


Respectfully submitted,

ARIEL AYANNA,
By his attorney,


Dated:      March 18, 2011          __/s/Rebecca G. Pontikes_____
                                    Rebecca G. Pontikes, BBO # 637157
                                    Tara M. Swartz, BBO# 652600
                                    PONTIKES & SWARTZ, LLC
                                    77 Franklin Street, 3rd Floor
                                    Boston, MA 02110
                                    (617) 357-1888
                                    Rpontikes@psemploymentlaw.com

## <u>CERTIFICATE OF SERVICE</u>

       I, Rebecca G. Pontikes, hereby certify that this document filed through the CM-ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 18, 2011.


                             /s/ Rebecca G. Pontikes

                             Rebecca G. Pontikes

19