UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                  )
ARIEL AYANNA,                     )
                                  )
            Plaintiff             )
                                  )
      v.                          )        Civil Action No. 10-12155-NMG
                                  )
DECHERT LLP,                      )
                                  )
            Defendant             )
_____ )


**DEFENDANT DECHERT LLP'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**


Daniel J. Cloherty (BBO No. 565772)
Serina Q. Barkley (BBO No. 660657)
Victoria L. Steinberg (BBO No. 666482)
COLLORA LLP
600 Atlantic Ave.
Boston, MA  02210-2211
(617-371-1000)
dcloherty@collorallp.com
sbarkley@collorallp.com
vsteinberg@collorallp.com

May 14, 2012                              *Attorneys for Defendant Dechert LLP*

## Introduction

Pursuant to Federal Rule of Civil Procedure 56 and Rules 7.1(B)(1) and 56.1 of the Local

Rules of this Court, Defendant Dechert LLP ("Dechert") submits this memorandum of law in

support of its Motion for Summary Judgment.  As discussed below, there is no factual or legal

support for the claims of sex discrimination and FMLA retaliation made by Plaintiff Ariel Ayanna

("Ayanna") against Dechert in his Amended Complaint ("the Complaint").  To the contrary, the

undisputed evidence in this case demonstrates that Dechert terminated Ayanna in December 2008

because of his unsatisfactory performance at work, including his markedly low billable hours.

Thus, this Court should enter judgment as a matter of law in favor of Dechert.

Moreover, even if Ayanna's claims of discrimination could somehow withstand scrutiny, he

would be entitled to no relief in this case.  Shortly after Ayanna was terminated, Dechert discovered

that Ayanna had routinely violated Dechert's policies by improperly charging the firm and its

clients for transportation to and from his Somerville home and for meals for himself, his wife and

his children.  In light of this misconduct, there is no dispute that, had he not already been terminated

for performance reasons, Dechert would have terminated Ayanna immediately after this misconduct

came to light.  Under these circumstances, Ayanna cannot possibly prevail on either of his claims.

## I.     BRIEF SUMMARY OF FACTS[1]

### A.     The Parties

Dechert is an international law firm with offices located in the United States, Europe, the

Middle East and Asia.  Stmt. ¶ 1. Dechert's lawyers practice in the areas of corporate law and

securities, complex litigation, finance and real estate, and financial services.  Id.  One of Dechert's

major practice groups is its Financial Services Group ("FSG").  Id. ¶ 3.  The FSG provides a wide

range of legal services to businesses in the global financial services industry.  Id.

---

[1] For a complete recitation of the relevant facts, Dechert incorporates its Statement of Undisputed Facts in Support of its Motion for Summary Judgment ("Stmt.") filed herewith pursuant to Local Rule 56.1.

Plaintiff Ariel Ayanna was hired as an Associate Attorney ("associate") by Dechert in September 2006 and was assigned to the FSG in Dechert's Boston office.  Id. ¶ 4.  His starting salary was $135,000 per year.  Id. ¶ 5.  Like all Dechert associates during the years 2006 through 2008, Ayanna was expected to bill at least 1,950 hours per year.  Id. ¶ 6.

**B.     Ayanna Relocates to Dechert's Office in Munich, Germany.**

In April 2007, Plaintiff's wife Amiri Ayanna received a scholarship to study in Germany. Id. ¶ 7.  In order to accommodate Ayanna and his family, Dechert allowed Ayanna to relocate and to work from the Munich office.  Id. 8.  Despite his relocation, Ayanna remained employed as an associate for the U.S. FSG and continued to be compensated as a Boston-based associate attorney, receiving a higher salary than the salaries paid to Dechert associates who were based in the Munich office.  Id.

**C.     Ayanna Takes FMLA Leave and Child Care Leave.**

In May 2008, while he was working in Germany, Ayanna's wife Amiri was pregnant with the couple's second child.  Id. ¶ 11.  On May 4, 2008, Amiri allegedly attempted suicide.  Id. ¶ 12. On May 9, 2008, Ayanna sent an e-mail to the attorneys in the Munich office explaining that his wife was ill and requesting permission to work from home.  Id. ¶ 13.  Ayanna's request was approved by Dechert.  Id.  On May 26, 2008, Ayanna asked to take an emergency unpaid FMLA leave to care for his wife.  Id. ¶ 14.  That request was also approved.  Id. ¶ 15.

On July 8, 2008, the Ayannas' second child was born.  Id. ¶ 19.  Thereafter, on July 21, 2008, Ayanna asked to terminate his unpaid FMLA leave and to start a four week paid leave pursuant to Dechert's child care leave policy.  Id. ¶ 20.  That request was approved.  Id. ¶ 23.

**D.     Ayanna Returns to Work in Dechert's Boston Office.**

On August 18, 2008, Ayanna returned to work at Dechert's Boston offices.  Id. ¶ 31.  That same day, Ayanna met with Dechert partner Christopher Christian to discuss assignments.  Id.  Mr.

Christian allegedly commented during that meeting that Ayanna looked "tired."  Id.  Later that same day, Ayanna wrote an e-mail to his wife stating that "working for Chris sucks."  Id. ¶ 32.

Throughout the Fall of 2008, Mr. Christian regularly apprised FSG Practice Group Manager Mary Mehr and FSG Co-Chair Joseph Fleming about his growing dissatisfaction with Ayanna's performance.  Id. ¶ 37.  Mr. Fleming instructed Mr. Christian to speak with Ms. Mehr to ensure that all projects were properly staffed but asked Mr. Christian to continue working with Ayanna to help him improve.  Id. ¶ 38.  Per this request, Mr. Christian continued to provide Ayanna with work assignments.  Id. ¶ 39.

On October 1, 2008, Ayanna informed Mr. Christian via email that he "had to take [his] suicidal wife to the hospital."  Id. ¶ 40.  Upon receiving this email, Mr. Christian stated: "Ariel: Sorry to hear that.  If you need some time to get things at home settled, just let us know."  Id. ¶ 41.  Christian also alerted Ms. Mehr and Mr. Fleming about Ayanna's communication.  Id. ¶ 42.  When Ayanna returned to work, Mr. Christian suggested to Ayanna that he take as much time as he needed to ensure his wife was cared for.  Id. ¶ 43.  Ayanna declined this offer.  Id.

Also in October 2008, Ayanna spoke with Mr. Fleming about his wife's apparent difficulties.  Id. ¶ 44.  In that discussion, Mr. Fleming reminded Ayanna of Dechert's policy of allowing associates to work part-time.  Id.  Ayanna, however, told Mr. Fleming that he would not take advantage of the firm's part-time policy, in part because he did not want the corresponding decrease in his salary, which at that time was $170,000 per year.  Id. ¶ 47.

**E.      Ayanna Receives a "Fair" Performance Evaluation.**

In late 2008, the FSG's human resources committee reviewed each of the FSG associates.  Id. ¶¶ 50-53.  That committee reviewed the hours that each FSG associate had billed during 2008, as well as comments from supervising attorneys.  Id. ¶ 53. As Mr. Fleming testified, an associate's billable hours at Dechert "are viewed very much as a proxy for performance.  Someone with lower

3

earning hours generally is not in high demand within the practice group.  And that can be an indicator, a significant indicator of whether somebody is performing well within the practice."  Id. ¶ 54.

From January 2008 through October 2008, Ayanna worked a total of 850 billable and 41 *pro bono* hours at Dechert.  Id. ¶ 59.  In order to account for his FMLA leave and his parental leave, however, his "annualized" hours for 2008 were adjusted upward to 1,460.  Id.  Even with this upward adjustment, Ayanna still ranked sixty-second out of the sixty-five FSG associates who were working at Dechert in late 2008.  Id. ¶ 60.

Ayanna's 2008 performance review also collected comments from various attorneys who had supervised Ayanna during 2008.  Id. ¶¶ 50, 53.  Mr. Christian's evaluation of Ayanna's "Written Expression" stated that "his work product is sloppy and shows a lack of attention to detail."  Id. ¶ 62.  Another supervising attorney evaluated Ayanna as lacking a commitment to his work, often turning in work-product that reflected an "I don't care" attitude.  Id. ¶ 64.

Based upon his low billable hours and the commentary from Ayanna's supervisors, the human resources committee assigned Ayanna a final overall ranking of "Fair."  Id. ¶ 67.  Ayanna's low billable hours were the predominant factor in making this determination.  Id. ¶ 68.

F.      **Dechert Terminates Ayanna.**

In December 2008, it was determined that all but one of the FSG associates who had received a rating of "Fair" would be terminated for performance reasons.  Id. ¶ 70.[2]  On December 17, 2008, Mr. O'Hanlon, Mr. Fleming and another Dechert partner, Geoff Kenyon, met with Ayanna to inform him of the termination decision.  Id. ¶ 73.  At that meeting, Mr. Fleming informed Ayanna that the effective date of his termination would be March 31, 2009.  Id. ¶ 74

---

[2] The one "Fair"-rated FSG associate who was not recommended for termination had been employed at Dechert for less than one year.  Id. ¶ 57.

G.      **Ayanna Openly Expresses His Unhappiness with "Big Law" Hours.**

Sometime between late December 2008 and early January 2009, Ayanna began working

with a Boston-based legal placement recruiter, Stephen Seckler.  Id. ¶ 77.  In a questionnaire that he

completed for Seckler, Ayanna wrote that he did not "presently have aspirations to return to a firm."

Id. ¶ 78.  Ayanna also told Secker that he "want[ed] to work reasonable hours" and that "[b]ig law

hours are not sustainable for my family.  This is a very important consideration for me."  Id.

After his termination, Ayanna also wrote to another Dechert associate about his future plans,

stating, "It is rough, just because I'm not sure what I'll do now, but I can't say I liked the job much

in the first place!  Chances are I'll end up somewhere other than a big firm!"  Id. ¶ 79.  Ayanna also

testified that he was considering applying for a position with the government, explaining that "one

of the things that appealed to me about the possibility of working for the government" was that "I

would not be required to be in the office as much as I was expected to be at Dechert."  Id. ¶ 80.

H.      **Dechert Learns that Ayanna Routinely Violated its Expense Policies.**

Dechert has formal, established policies regarding certain employee expenses, including meal

allowances and taxi service.  Id. ¶¶ 81-82.  Those policies place limits on when an attorney may

seek reimbursement for meals and transportation costs incurred as a result of work obligations.  Id.

In early 2009, after Ayanna had been terminated, one of Dechert's clients contacted Mr.

Christian and inquired about meal expenses that had been charged by Ayanna to the client's account

on a date when Ayanna had billed for less than an hour of work.  Id. ¶ 83.  In response, Mr.

Christian reviewed the client's bills and determined that the expenses were inappropriate.  Id.  He

accordingly wrote off the expense and credited the client's invoice.  Id.  After this event, Mr.

Christian became concerned that Ayanna's improper expensing may have extended beyond that one

client.  Id. ¶ 84.  Accordingly, Mr. Christian asked Ms. Mehr to inventory the expenses that had

been charged by Ayanna during the Fall of 2008.  Id.

Thereafter, Ms. Mehr created a spreadsheet reflecting Ayanna's expenses for the period between August 2008 and December 2008.  Id. ¶ 85.  The spreadsheet showed that during that period,  Ayanna had expensed thirty-nine different taxi charges and over thirty different meals to Dechert and various clients.  Id. ¶ 86.  He did so even on days when he had performed little or no work for the client on the day of the charge.  Id. ¶ 88.  Notably, Ayanna's meal charges reflected meals that were consumed not only by him, but also by his wife and children.  Id. ¶ 89.  Indeed, at his deposition in this case, Ayanna readily acknowledged that he had routinely ordered meals for his family and charged the expenses to Dechert and its clients, testifying that he did so "more than occasionally."  Id. ¶ 90.[3]

In April 2009, Ms. Mehr provided the spreadsheet regarding Ayanna's expenses to Dechert's in-house General Counsel Arthur Newbold.  Id. ¶ 88.  Mr. Newbold testified that he was "appalled and horrified" by Ayanna's abuse of firm policies and that in his years at Dechert, he "had never run across anything similar."  Id. ¶ 93.  Mr. Newbold testified that, had Ayanna been employed by Dechert at the time of this discovery, Ayanna would been immediately terminated, explaining, "I've never seen this happen before, but it wouldn't be a close question."  Id. ¶ 95.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Chadwick v. Wellpoint, Inc., 561 F.3d 38 (1st Cir. 2008).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  See Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996).  Deposition testimony and

---

[3] There is no doubt that Ayanna knew that his conduct violated firm policies.  On August 19, 2008, one day after returning from leave, he wrote to his wife: "I can try to coordinate dinner better and bring home something for you to share, though I am nervous about getting two courses since they have cracked down on costs somewhat.  I'll get one big thing and not eat too much."  Stmt. ¶ 92.

affidavits that merely reiterate allegations made in the complaint, without providing specific factual

information made on the basis of personal knowledge are insufficient to defeat summary judgment.

Roslindale Coop. Bank v. Greenwald, 638 F.2d 258, 261 (1st Cir. 1981).

### III.   ARGUMENT

**A.    There is No Evidence to Support Ayanna's Claim of Sex Discrimination.**

Ayanna's claim of sex discrimination pursuant to Mass. Gen. Laws c. 151B (Count I) is

governed by the three-step, burden-shifting framework outlined in McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 802 (1973); Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir.

2003).  Under this framework, Ayanna must first establish a *prima facie* case of sex discrimination.

If he can do so, the burden shifts to Dechert to present a legitimate, non-discriminatory reason for

its employment decision.  Finally, once Dechert presents a non-discriminatory reason for the

termination, the burden is placed back on Ayanna to demonstrate that the non-discriminatory reason

is a mere pretext and that the true reason for the employment decision was discrimination.  Id.

**1.    Ayanna Cannot Establish a *Prima Facie* Case of Sex Discrimination.**

To establish a *prima facie* case of sex-based discrimination, a plaintiff must present

sufficient facts to establish that "(1) he belonged to a protected class . . .; (2) he was performing his

job at a level that rules out the possibility that he was fired for job performance; (3) he suffered an

adverse job action by his employer; and (4) his employer sought a replacement for him with roughly

equivalent qualifications."  Benoit, 331 F.3d at 173 (citing Smith v. Stratus Computer, Inc., 40 F.3d

11, 15 (1st Cir. 1994)); see also Holloway v. Thompson Isl. Outward Bound Ed. Center, 492 F.

Supp. 20, 24 & n.8 (D. Mass. 2007) (citing same standard).

Ayanna's sex discrimination claim falls well short of satisfying this *prima facie* standard.

Even assuming *arguendo* that Ayanna—a white male attorney—is a member of a protected class,[4]

---

[4] Although his Complaint is remarkably vague on this point, it appears that Ayanna claims to fall into a
protected class because he is a man who took on a caregiving role that he deems to be a uniquely "female"
role.  See Complaint ¶ 27.  His claim itself relies on stereotyping and sweeping, offensive allegations such as

the undisputed facts show that he fails the second prong of the *prima facie* standard because he did not perform his job at an acceptable level prior to his termination. As noted above, Ayanna's annualized billable hours for 2008 were nearly *five hundred* hours lower than what was expected of Dechert associates on an annual basis. Stmt. ¶¶ 6, 59. Indeed, Ayanna's annualized billable hours for 2008 ranked *sixty-second* out of the sixty-five FSG associates who worked at Dechert in 2008. Id. ¶ 60. If that were not enough, Ayanna's performance evaluation presents a picture of performance marred by missed deadlines, inconsistent work, and an "I don't care" attitude. See Stmt. ¶¶ 63-66.

Ayanna's inability to show that he was performing at an adequate level at the time of his termination is fatal to his *prima facie* claim of discrimination. Holloway, 492 F. Supp. 2d at 24 (*prima facie* case fails where plaintiff was "persistently tardy, failing to show up for work and defying the instructions of his supervisors"); accord Hillstrom v. Best Western TLC Hotel, 265 F. Supp. 2d 117, 124 (D. Mass. 2003).[5] To be sure, plaintiffs in employment discrimination cases are often able to establish a *prima facie* case with "relative ease," and the battle between employee and employer is more typically fought at the pretext stage. See Hillstrom, 265 F. Supp. 2d at 125. Here, however, the undisputed record demonstrates that Ayanna cannot even satisfy this initial standard.

### 2.   Ayanna's Low Billable Hours and Substandard Performance Were Legitimate, Non-Discriminatory Reasons For His Termination.

Even if Ayanna could establish a *prima facie* case of sex discrimination (and he cannot), there is no dispute that Dechert has articulated a legitimate, non-discriminatory reason for terminating Ayanna's employment. Specifically, Ayanna's termination was based upon his

the outrageous claim that male Dechert attorneys are not "equal co-parents" with their partners. See Complaint ¶¶ 11,15.

[5] Ayanna also fails the final prong of the *prima facie* standard because he has not and cannot show that he was replaced *at all* – much less that he was replaced by a person with the same qualifications but outside his allegedly protected category. Dechert notified the lowest-performing associates in the FSG of their termination in December 2008. And Dechert did not hire any associate to take Ayanna's place. Stmt. ¶ 71.

performance as an associate at the firm, including his low billable hours.  That performance resulted in an overall "Fair" rating on Ayanna's review in late 2008, which in turn led to his termination.

In late 2008, Dechert followed its established process for evaluating associates.  Stmt. ¶ 50. The members of Dechert's FSG human resources committee reviewed the hours that each FSG associate billed during the review period.  Id. ¶¶ 52-53.  The members of the committee also collected and reviewed comments from senior attorneys with whom those associates worked over the course of the previous year.  Id. ¶ 53.  Ayanna received a rating of "Fair" because of his sub-par performance, including his low billable hours.  Id. ¶ 67.  Indeed, Ayanna's annualized billable hours—even after being adjusted to account for his leave—were among the lowest of all FSG associates.  Id. ¶ 60.  Thus, there is no dispute that his billable hours were the "predominant factor" in determining his "Fair" rating.  Id. ¶ 68.  And if that were not enough, there is ample evidence in the record regarding Ayanna's less than satisfactory performance during the hours he *did* work.  Id. ¶¶ 25, 36-38, 62-66.

Based on his "Fair" rating in 2008, Ayanna was selected for termination along with every one of his "Fair"-rated colleagues – male and female – who had been at Dechert for at least a year. Stmt. ¶ 70-72.[6]  Accordingly, each of these six FSG associates was informed that their employment with the firm would terminate at the end of March 2009.  Id. ¶ 74.  In short, Dechert applied its evaluation process to Ayanna's performance, evaluated him accordingly, and took the same employment action as to him as it did to others who were similarly situated.  This evidence is plainly sufficient to establish Dechert's legitimate, non-discriminatory basis for Plaintiff's termination.  Douglas v. J.C. Penney Co., Inc., 474 F.3d 10 (1st Cir. 2007) (employee's failure to meet sales goals was legitimate, non-discriminatory reason for termination); accord Kirby v. Payless Shoesource, Inc., 2008 WL 4381917 (D. Mass. 2008); Bonilla, 608 F. Supp. 2d at 315.

---

[6] There were no FSG associates who received a rating of "Poor" in 2008.  Thus, the associates who received "Fair" ratings were the lowest rated associates in the FSG in 2008.  Id. ¶ 69.

### 3.     Dechert's Reasons for Terminating Ayanna Were Not Pretexts.

Because Dechert has proffered valid, non-discriminatory reasons for Ayanna's termination, Ayanna carries the burden of proving that those reasons amount to a pretext for unlawful discrimination.  See Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 34 (1st Cir. 2001).  "[T]he question becomes: has the plaintiff introduced sufficient material to demonstrate that there is a genuine issue of material fact whether the defendant's proffered reason is a pretext; that is, 'Does the employer's articulated reason lack[ ] reasonable support in evidence or is [it] wholly disbelievable[?]."  Brooks v. Peabody & Arnold, LLP, 71 Mass. App. Ct. 46, 52 (2008) (citing Lewis v. Area II Homecare for Senior Citizens, Inc., 397 Mass. 761, 765 (1986)).  "The employer's reasons need not be wise, so long as they are not discriminatory and they are not pretext."  Id.

Here, not a shred of evidence supports the contention that Dechert's reasons for termination were pretextual.  Ayanna does not challenge the fact that his annualized billable hours in 2008 were remarkably low.  Nor could he plausibly do so.  And Ayanna has adduced no evidence to challenge the bases for the various critiques of his performance that are set forth in his performance review.  Finally, and perhaps most critically, Ayanna fails to point to any facts that remotely suggest that he was he was fired on the basis of sex discrimination.

### a.     There is No Dispute Regarding Ayanna's Billable Hours in 2008.

Between January 2008 and October 2008, Ayanna worked a total of 850 hours at Dechert.  Stmt. ¶ 59.  During that same period Ayanna worked 41 *pro bono* hours.  Id.  When those hours were  annualized to account for his two leaves, his annualized 2008 hours totaled 1,460—an amount that is 490 hours *below* the 1,950 hours that are expected of Dechert associates.  Id.

Ayanna does not and cannot dispute these numbers.  Nor can he plausibly dispute the fact that these low billable hours were the predominant factor in Ayanna's overall "Fair" rating—the rating that led to his termination.  Id. ¶ 70.  As Mr. O'Hanlon testified, "it would be . . . unusual for someone with fairly low productivity to get above a 'fair' because . . . essentially the definition of

'good' assumes a certain level of productivity." Id. ¶ 56.  Mr. Fleming likewise explained that

billable hours are a "proxy" for an associate's overall performance.  Id. ¶ 54.[7]

Accordingly, any claims of pretext by Ayanna must necessarily fail.  Indeed, any suggestion

that Dechert's reliance upon Ayanna's billable hours was a "pretext" for sex discrimination is

patently absurd.  Dechert—which was compensating Ayanna at a rate of more than $170,000 per

year—had every right to consider Ayanna's billable hours in making its employment decision.  As

Mr. Fleming testified, "We pay top salaries, at billing rates that are commensurate with the high

salaries that we pay associates, and so the expectations – our client's expectations – are quite high

for our delivery of service, and accordingly, we expect a lot from our associates."  Id. ¶ 55.

### b.   There is No Evidence Challenging the Comments in Ayanna's Review.

Nor is there any dispute that Ayanna's 2008 performance evaluation contained a series of

troubling comments from supervising attorneys.  See Stmt. ¶¶ 62-66.  Ayanna has presented *no*

evidence (other than perhaps his own self-serving views)[8] that any of these comments were

inaccurate.  To the contrary, facts developed in discovery have only buttressed these observations of

Ayanna's skills and performance.  In his deposition, Mr. Christian, who worked closely with

Ayanna in 2008, provided ample details about a range of performance issues that arose with

Ayanna, including Ayanna's consistent unavailability for assignments, inaccurate information in his

work product, missed deadlines, and a lackadaisical approach to work.  See Stmt. ¶¶ 25, 33, 36-38.

To be sure, Ayanna—like the five other terminated FSG associates—received some positive

comments in his 2008 review.  However, this unremarkable fact does nothing to rebut the evidence

regarding Ayanna's sub-par performance (including his low billable hours).  Dechert's assessment

---

[7] Accordingly, the two FSG associates who had lower annualized hours than Ayanna also received "Fair" ratings and were also terminated in December 2008.

[8] See Quinones v. Buick, 436 F. 3d 284, 290 (1st Cir. 2006) (plaintiff's self-serving statements regarding his performance insufficient to rebut employer's contentions of poor performance).

of Ayanna's performance is unrefuted, and courts "may not sit as super personnel departments,

assessing the merits—or even the irrationality—of employers' nondiscriminatory business

decisions." See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991).

### c.   Ayanna Has Presented No Evidence of Discriminatory Animus.

Of course, even if Ayanna were able to present evidence suggesting that Dechert's

evaluation of him as "Fair" was somehow inaccurate or incorrect, that would be insufficient to

sustain his claim of sex discrimination.  Ayanna must still "present at least some evidence that

would warrant a finding that a discriminatory animus was at work in bringing about the adverse

employment action."  See King v. City of Boston, 71 Mass. App. Ct. 460, 468 (2008) (citing Bray

v. Community Newspaper Co., 67 Mass. App. Ct. 42, 45 (2008)); Thomas v. Eastman Kodak Co.,

183 F.3d 38, 64 (1st Cir. 1999).  Thus, in order to avoid summary judgment, Ayanna must present

some evidence suggesting "that the challenged action 'occurred in circumstances that raise an

inference of unlawful discrimination.'"  Id. (citing Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34,

45 (2005)).

But no such circumstances exist in this case.  To the contrary, the undisputed evidence

shows that Dechert *accommodated* Ayanna in every way that he requested.  For example, in April

2007, after a mere six months of employment, Dechert granted Ayanna's request to work in

Dechert's Munich office.  Stmt. ¶ 8.  In May 2008, after Ayanna notified Dechert of complications

arising from his wife's pregnancy, Dechert agreed to allow Ayanna to work from home in order to

care for her.  Id. ¶ 13.  When Ayanna determined that his family situation required him to stop

working and take an immediate leave, that request was granted without delay.  Id. ¶¶ 14-15.  Later

in 2008, when Ayanna sought permission to arrive at work later in the morning to be able to bring

his son to school, that request was immediately granted.  Id. ¶ 48.  And in October 2008, when

Ayanna's wife was apparently experiencing some further health complications, the firm made sure

that Ayanna was aware of its policy permitting part-time employment—an option that Ayanna

declined to pursue.  Id. ¶¶ 44-47.  Thus, despite the inflammatory claims in Ayanna's Complaint, the record is replete with undisputed evidence of Dechert's efforts to allow Ayanna to succeed both personally and professionally.

Nor has Ayanna adduced any evidence to support the allegations in his Complaint that he was somehow the victim of a "culture" which would not treat a man fairly unless he delegated all family responsibilities to his wife.  See, e.g., Complaint ¶¶ 11, 63.  Ayanna did not depose any of the individuals who he claims made statements regarding this supposed "culture," and he has not identified a single shred of evidence to buttress his claims.  For example, Ayanna's allegations include claims that two Dechert lawyers supposedly "bragged" about working so much that they ignored their family obligations.  See Complaint at ¶ 12.  In his deposition, however, Ayanna was unable to recall the date, time, location of these alleged comments.  Stmt. ¶¶ 34-35.[9]

But even assuming for the sake of argument that Ayanna's peers *did* make these statements, they are wholly insufficient to establish that Dechert's stated reasons for Ayanna's termination were pretextual.  The comments do not concern Ayanna in any way.  And they were allegedly made over *one year* before Ayanna's termination.  Thus, the comments are not probative of any discriminatory animus by Dechert.  See Bonilla v. Electrolizing, Inc. 608 F. Supp. 2d 307, 315 (D. R.I. 2005) (irrelevant stray co-worker remark[s] by non-decision makers was insufficient evidence of pretext to survive summary judgment); Straughn, 250 at 36 (1st Cir. 2001) (probativeness of remarks diluted by temporal distance).

In fact, at his deposition, Ayanna was able to identify only one discriminatory comment that was supposedly directed towards him by any Dechert partner at any time.  Specifically, Ayanna contends that on his first day back in the Boston office in August 2008, Mr. Christian told Ayanna

---

[9] Of course, even if Ayanna could recall the specifics regarding these supposed statements, they are inadmissible hearsay.  See Bennett v. Saint-Gobain Corp., 507 F.3d 23, 28-29 (1st Cir. 2007) (citing Davila v. Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 17 (1st Cir. 2007)).

that he looked "tired."  Stmt. ¶ 31.  As an initial matter, a single comment made by a non-decision

maker is not capable of supporting an inference of pretext.  See Velazquez-Fernandez v. NCE

Foods, Inc., 476 F.3d 6, 11 (1st Cir. 2007).  But even more importantly, the "tired" comment—even

assuming it did occur—cannot reasonably be understood to reflect a discriminatory animus by Mr.

Christian, and does not come close to creating a material dispute of fact on the issue of pretext.

Equally absurd are Ayanna's allegations that the general "culture" of Dechert punished men

such as Ayanna who supposedly did not fit an allegedly stereotypical "male" role.  See, e.g.,

Complaint ¶¶ 11, 53, 63.  As an initial matter, recitations of Ayanna's perception of the "culture" at

Dechert do not give rise to material disputes of fact relevant to his claims, and are insufficient as a

matter of law to defeat summary judgment.  "Even in employment discrimination cases where

elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-

moving party rests merely upon conclusory allegations, improbable inferences, and unsupported

speculation."  Andujar v. Nortel Networks, 400 F.Supp.2d 306, 327 (D. Mass. 2005) (quoting

Benoit, 331 F.3d at 173).

But just as important, discovery in this case has revealed that Ayanna's allegations about that

supposed "macho" culture at Dechert are patently false.  For example, in his Complaint, Ayanna

alleges that Dechert attorney Thomas Gierath took no time off when his children were born.  See

Complaint ¶ 47.  That claim is simply not true.  Mr. Gierath in fact *did* take time off from work after

each one of his children was born.  Stmt. ¶ 28.  Similarly, Ayanna's Complaint asserts that Mr.

Christian "fits the male stereotype" because his "wife is a full time, and the primary, caretaker for

their child."  See Complaint ¶ 53.  In fact, at the time Ayanna worked for Dechert, Mr. Christian's

wife was a full-time attorney employed at another Boston law firm. Stmt. ¶ 27.  Nor is there support

for Ayanna's preposterous allegation that "not one male attorney" took twelve weeks of FMLA

leave or the full amount of paternity leave while he was employed at Dechert.  Complaint    ¶ 46.

To the contrary, at least three male attorneys took twelve weeks of FMLA leave during Ayanna's brief tenure at the firm, while more than thirty male attorneys took four weeks of paid child care leave during the same period.  Stmt. ¶¶ 29-30.[10]

Finally, Ayanna cannot survive summary judgment based on the untenable position that Dechert had an obligation to overlook Ayanna's weak performance (including his low billable hours) because it might have been affected by his non-work-related family obligations.  Nothing in Chapter 151B prevents Dechert from evaluating Ayanna and dismissing him based on his sub-par performance.  See Chadwick v. Wellpoint, Inc., 561 F.3d 38, 45 (1st Cir. 2009) ("It is undoubtedly true that if the work performance of a woman (or man for that matter) actually suffers due to childcare responsibilities (or due to any other personal obligation or interest) an employer is free to respond accordingly, at least without incurring liability under Title VII"); Guglietta v. Meredith Corp., 301 F. Supp. 2d 209, 213-214 (D. Conn. 2004) ("Although Plaintiff seemingly contends that her status is that of a 'woman with child,' her actual claim appears to be that of a 'woman with childcare difficulties.'").  Accordingly, Ayanna's sex discrimination claim must be rejected.

### B.    There is No Evidence to Support Ayanna's FMLA Retaliation Claim.

#### 1.    Ayanna Cannot Establish a *Prima Facie* Case of Retaliation.

Ayanna's FMLA retaliation claim (Count II) is governed by the same McDonnell Douglas framework as his claim of sex discrimination.  See Hodgens v. Gen Dynamics Corp., 144 F.3d 151, 160-161 (1st Cir. 1998).  Ayanna must first establish a *prima facie* case that he was terminated in retaliation for his decision to take FMLA leave.  A *prima facie* case of FMLA retaliation requires proof that: (1) Ayanna engaged in the protected conduct of taking FMLA leave; (2) he was

---

[10] Of course, Mr. Gierath's leave following the birth of his children, the employment status of Mr. Christian's wife, and how many male Dechert attorneys took a certain number of weeks of leave, are simply not relevant to Ayanna's claims.  Thus, even if Ayanna's fabrications regarding the supposed "macho culture" were supported by evidence, those purported facts would not support Ayanna's claims.  See Patten v. Wal-Mart Stores E., Inc., 300 F.3d 21, 25 (1st Cir. 2002).

terminated; and (3) the protected conduct and the termination were causally connected.  See Orta-Castro v. Merck, Sharp & Dohme Quimica P.R. Inc., 447 F.3d 105, 113-14 (1st Cir. 2006).

Ayanna's claims fail the third prong of this *prima facie* standard because there is no support for Ayanna's assertion that his FMLA leave and his termination were in any way causally connected.  Ayanna was told of his termination at a meeting on December 17, 2008, approximately five months after his FMLA leave ended.  Stmt. ¶ 73.  The five-month span between Ayanna's leave and his termination is insufficient as a matter of law to support a *prima facie* case of FMLA discrimination.  See Holloway, 492 F. Supp. 2d at 25-26 (a period of "some three to four months" between protected activity and termination was insufficient to show the required causal link).[11]  In short, "[u]nless the adverse action comes very closely on the heels of the protected activity, a plaintiff must adduce evidence of causality that goes beyond mere temporal proximity."  Rhodes v. JPMorgan Chase & Co., 562 F. Supp. 2d 186, 192 (D. Mass. 2008); See also O'Reilly v. Consolidated Edison Co. of New York, Inc., 173 Fed. Appx. 20, 22 (2d Cir. 2006).  Ayanna cannot do so here, so his claim of FMLA retaliation cannot survive.

### 2.   Ayanna's Weak Performance and Low Billable Hours Were Legitimate, Non-Discriminatory Reasons For Terminating His Employment.

Regardless, there is no doubt that Dechert has proffered legitimate, non-discriminatory reasons for terminating Ayanna's employment.  As explained *supra*, Ayanna's termination was based upon his substandard performance as an associate at the firm during the 2008 period, including his low billable hours.  Thus, even if Ayanna could make out a *prima facie* case for FMLA retaliation, he still bears the burden of showing that Dechert's reasons for terminating him were a pretext for Dechert's supposed retaliation against Ayanna for taking FMLA leave.

---

[11] It is well established that "[t]he mere fact that one event followed another is not sufficient to make out a causal link."  MacCormack v. Boston Edison Co., 423 Mass. 652, 662 n. 11 (1996).

**3.      Dechert's Reasons for Termination Were Not Pretexts for "Retaliation."**

But, just as with his sex discrimination claim, Ayanna cannot muster any evidence to satisfy his burden of proving that Dechert's proffered reasons for his termination were pretexts for retaliation.  There is absolutely no evidence that the FSG human resources committee considered Ayanna's leave when it assigned him a rating of Fair.  Stmt. ¶¶ 57-58.  And as we have already discussed, Ayanna's reliance upon stray comments from other Dechert associates regarding how those associates may (or may not) have balanced their work and family obligations is woefully insufficient to support any claim of discriminatory retaliation.[12]  Nor can Ayanna's FMLA claim be supported by his baseless allegations regarding a so-called "macho" culture at Dechert.

Thus, Ayanna is left with his assertions that an anti-FMLA animus can be inferred from (1) Dechert's refusal to advance unearned vacation time to Ayanna in order to pay him during his otherwise unpaid leave, and (2) his claim that he was given less billable work after he returned from leave.  But neither of these claims have merit.  *First*, Ayanna acknowledged in his deposition that he is in fact not aware of any instance where Dechert has ever advanced unearned vacation time to any employee, and Dechert, as a policy, does not do so.[13]  Id. ¶ 18.  See Parra, 605 F. Supp. 2d at 330 (evidence of animus fails where plaintiff fails to rebut defendant's uncontroverted evidence that general practice was applied to all employees).  *Second*, it is undisputed that following his FMLA leave, in September and October 2008, Ayanna billed 143 hours and 142 hours, respectively – *more* hours per month than he had billed monthly for all but one month in 2008 *before* he took leave.  Id. ¶ 59.  Accordingly, any assertion that Ayanna was somehow "deprived" of work after his FMLA leave is simply not true.

_____

[12] None of the comments referred to Ayanna's FMLA leave in any way – and in fact, nearly all of the comments purportedly occurred well before he took FMLA leave.

[13] This is yet another example of an allegation in Ayanna's Complaint that is simply false.  See Complaint ¶ 49 ("Dechert advances vacation time to associates for non-FMLA related purposes.").

Given the dearth of evidence suggesting that Ayanna's termination had anything to do with his FMLA leave, Ayanna's claim of retaliation "strains credulity" and summary judgment must enter in Dechert's favor on Count II.  See <u>Schumacher v. Fairfield Resorts Inc.</u>, 2008 WL 821569 * 24 (D. R.I. 2008).  Indeed, even if Ayanna could present some sliver of pretext in support of his claim of retaliation, summary judgment must enter because the undisputed facts of Dechert's nondiscriminatory basis for termination grossly outweigh Ayanna's baseless speculation that his FMLA leave was somehow relevant to his leave.  See <u>Parra</u>, 605 F.Supp. at 314 (citing <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 148 (2000)).

**C.**     **<u>Plaintiff's Misconduct Bars His Recovery of Any Damages Because He Would Have Been Terminated for Misconduct.</u>**

Finally, there is no doubt that Ayanna engaged in misconduct during his employment which bars him from recovering any damages in this case.  Because Ayanna engaged in admittedly wrongful and unethical conduct at Dechert that would have led to his immediate termination, Ayanna can claim no damages in this case.  Accordingly, that misconduct provides an independent basis for the rejection of his claims for relief.

As discussed above, in early 2009, Dechert learned that Ayanna had been engaged in gross misconduct relating to abuses of the firm's expense policies.  Specifically, Dechert learned that over a period of less than four months prior to his termination, Ayanna had charged over $2,400.00 to Dechert and its clients for meals and transportation to which he was not entitled under the firm's policies.  Indeed, a spreadsheet of Ayanna's expenses in late 2008 shows that he often charged meals and taxi service to the firm and its clients even when he had done little to no work for the client.  Stmt. ¶ 88.  At his deposition, Ayanna readily admitted his misconduct.  <u>Id.</u> ¶¶ 90-91.

Ayanna's wrongdoing requires that summary judgment enter on Ayanna's claims arising from his termination from Dechert.  Anti-discrimination laws do "not constrain employers from exercising significant other prerogatives and discretions in the course of the hiring, promoting, and

discharging of their employees." McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 361 (1995) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 239 (1989)).  Thus, when the former employer discovers evidence of wrongdoing after a plaintiff's termination, "the employee's wrongdoing becomes relevant not to punish the employee, or out of concern 'for the relative moral worth of the parties,' but to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's wrongdoing." McKennon, 513 U.S. at 361 (internal citations omitted).

Under McKennon, plaintiffs in employment discrimination cases may not place themselves in a better position than they would have been in but for their termination.  See Clemente v. Crane, 97 F.3d 1445, fn. 15 (1st Cir. 1996) ("It is not difficult to imagine a situation where…an illegally discharged employee might win a civil rights suit, yet still walk away empty-handed. . . .For instance, if the employer discovers the after-acquired evidence which would justify termination on the same day as the illegal discharge, or shortly afterwards, plaintiff's back-pay damages would be nonexistent or minimal.").

Here, it is undisputed that Ayanna was aware of Dechert's meal and taxi service policies. Stmt. ¶ 90.  Nor is there any dispute that the Dechert policies provided for meal or taxi service to be billed for reimbursement only under certain circumstances, such as when an attorney works beyond 8:00 p.m. on a weekday *and* provided that the attorney's work continues for a reasonable period of time after the meal.  Id. ¶ 81.  The policies provided that transportation costs could only be appropriately billed to a client under the policy if commuting services are unavailable, significantly inconvenient, or a risk to a person's safety.  Id. ¶ 82.  And, as any competent and ethical attorney would understand, it is simply common sense that neither meals nor taxi service should be billed to a client if little to no work has been done for the client that day.

Put simply, the frequency and amount of the expenses incurred by Ayanna during his term at the firm reflected a lack of honesty, poor judgment, disrespect for Dechert's clients and the firm itself, and a blatant disregard for Dechert policies.  Stmt. ¶ 93-95.  Nor can there be any doubt that Ayanna's wrongdoing "was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it."  McKennon, 513 U.S. at 362-363.  Indeed, Dechert's General Counsel Arthur Newbold testified that, had Ayanna not already been terminated, he would have been terminated immediately when this information came to light.  Stmt. ¶ 95.  Mr. Newbold testified that it "wouldn't be a close question," that he would "make sure" that anyone who engaged in this conduct would be fired.  Stmt. ¶ 95.[14]

Accordingly, because it is undisputed that Ayanna would have been terminated for his misconduct, he is barred from recovering on either of his claims .  See Aubuchon v. Knauf Fiberglas, GMBH, 240 F.Supp.2d 859, 871 (S.D. Ind. 2003); accord Clemente, 97 F.3d at 1445 n. 15; Prozinski v. Ne. Real Estate Services, LLC, 59 Mass. App. Ct. 599, 611-12 (2003).

## IV.  CONCLUSION

For all the foregoing reasons, Dechert respectfully requests that its Motion for Summary Judgment be granted, and that the Court grant judgment in its favor and against the Plaintiff on Counts I and II of the Amended Complaint.

---

[14] See Pastrana v. Local 9509, Communications Workers of Am., AFL-CIO, 2011 WL 9391 (S.D. Cal. 2011) ("An employer is entitled to rely on sworn affidavits from its employees in proving that it would have discharged the plaintiff for the alleged misconduct.") (citing O'Day v. McDonnell Douglas Helicopter Co., 79 F.3d 756, 762 (9th Cir. 1996)); see also Coleman, 997 F.Supp. at 1122-1123 (affidavit of Director of Human Resources stating that employee dishonesty was grounds for immediate termination and he would have terminated Plaintiff for misrepresentation on employment application was sufficient).

Respectfully submitted,

*/s/ Daniel J. Cloherty*
Daniel J. Cloherty (BBO No. 565772)
Serina Q. Barkley (BBO No. 660657)
Victoria L. Steinberg (BBO No. 666482)
COLLORA LLP
600 Atlantic Ave.
Boston, MA  02210-2211
617-371-1000
dcloherty@collorallp.com
sbarkley@collorallp.com
DATED:  May 12, 2012                    vsteinberg@collorallp.com

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 14, 2012.

*/s/ Daniel J. Cloherty*