UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                          )
ARIEL AYANNA,                             )
                    Plaintiff             )
                                          )
        v.                                )        Civil Action No. 10-12155-NMG
                                          )
DECHERT LLP,                              )
                    Defendant             )
_____)

**DEFENDANT DECHERT LLP'S STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Rules of

this Court, Defendant Dechert, LLP ("Dechert") hereby submits the following statement of

material facts of record as to which there is no genuine issue to be tried in this matter.

**A.      The Parties.**

1.       Dechert LLP is an international law firm with offices throughout the United

States, Europe, the Middle East and Asia.  See Declaration of Mary Mehr in Support of

Defendant Dechert LLP's Motion for Summary Judgment ("Mehr Declaration") ¶ 1.  Dechert's

lawyers practice in the areas of corporate and securities, complex litigation, finance and real

estate, and financial services.  Id.

2.       Dechert's attorneys are divided into different practice groups such as corporate,

real estate, litigation and financial services.  See Mehr Declaration ¶ 2.  Each attorney employed

by Dechert is assigned to a particular practice group.  Id.

3.       Dechert's Financial Services Group ("FSG") is one of the firm's major practice

groups.  See Mehr Declaration ¶ 3.  The FSG provides a wide range of legal services to

businesses in the global financial services industry, including advising clients regarding the

formation and operation of mutual funds, hedge funds, new product development, regulatory compliance, acquisition of investment management firms, tax structuring, ERISA and employee benefits.  Id.

4.      Plaintiff Ariel Ayanna was hired as an Associate Attorney ("associate") by Dechert in September 2006 and was assigned to the FSG in Dechert's Boston office.  See Mehr Declaration ¶ 5; Deposition of Ariel M. Ayanna, October 6, 2011 ("Ayanna Depo.) at 15-16.[1]

5.      Ayanna's starting salary in September 2006 was $135,000 per year.  See Mehr Declaration ¶ 5.  In January 2007, his annual salary was increased to $160,000.  Id.  In January 2008, his annual salary was increased to $170,000.  Id.

6.      As with all Dechert associates during the years 2006 through 2008, Ayanna was expected to bill at least 1,950 hours per year on client related and *pro bono* matters.  See Ayanna Depo. at 72; Mehr Declaration ¶ 5.

**B.      Ayanna Transfers to Dechert's Office in Munich, Germany.**

7.      In April 2007, Mr. Ayanna's wife Amiri Ayanna received a scholarship to study in Munich, Germany.  See Ayana Depo. at 64-65.  Ayanna requested that Dechert place him in a "secondment" in Munich.  Id. at 62.  At Dechert, a "secondment" allows an employee to temporarily change job roles and/or offices within the Dechert organization.  See Mehr Declaration ¶ 6.  Dechert denied the request because the Munich office did not have a need for a second-year, English-speaking associate.  See Ayana Depo. at 62-64 and Depo. Ex. 4; Mehr Declaration ¶ 7.

---

[1] Consistent with Rule 56.1 of the Local Rules of this Court, all excerpts of deposition transcripts cited herein have been submitted to this Court as exhibits.  See Appendix of Deposition Transcripts and Exhibits in Support of Defendant Dechert's Motion for Summary Judgment (filed concurrently).

8.      Despite its denial of Ayanna's request for a "secondment," Dechert allowed Ayanna to relocate to Germany and to work from Dechert's Munich office.  <u>See</u> Ayanna Depo. at 65' O'Hanlon Depo. at 93.  During that period, however, Mr. Ayanna remained a U.S.-based FSG associate and he continued to be paid in accordance with the salary structure applicable to Dechert's U.S.-based associates.  <u>See</u> Ayanna Depo. at 67; O'Hanlon Depo. at 68; Mehr Declaration ¶ 7.  At the time, associates in Dechert's Munich office were paid at a lower rate than Dechert's U.S.-based associates.  <u>See</u> Ayanna Depo. at 67; O'Hanlon Depo. at 68; Mehr Declaration ¶ 7.

9.      Before Ayanna left for Munich, Mary Mehr, the Practice Group Director of the FSG , contacted various Dechert attorneys whose caseload might include some international, English-language work, including Dechert partners Marc Seimetz, Christopher Christian, Karen Anderberg, Joe Smallhoover, Angelo Lercara and John O'Hanlon.  <u>See</u> Mehr Declaration ¶ 8.  Ms. Mehr informed these attorneys that Ayanna was temporarily relocating to Germany, but that he would still be working as a U.S. associate, and that he would be available for work assignments.  <u>See</u> Mehr Declaration ¶ 8.  Ms. Mehr also informed Ayanna that he was expected to follow-up directly with other FSG attorneys to obtain assignments himself in order to fulfill his billable hours requirement.  <u>See</u> O'Hanlon Depo. at 65, 91-92; Mehr Declaration ¶ 8.

10.     Ayanna worked in Dechert's Munich office from September 2007 through May 2008.  <u>See</u> Ayanna Depo at 62, 95; Mehr Declaration ¶9.

### C.   <u>Ayanna Takes Leaves Under the Family Medical Leave Act (FMLA) and Dechert's Child Care Leave Policy.</u>

11.     In May 2008, while he was still working in Germany, Ayanna's wife Amiri was pregnant with the couple's second child.  <u>See</u> Ayanna Depo. at 123.

12.      On May 4, 2008, Amiri allegedly attempted suicide  See Ayanna Depo. at 83-85. Ayanna did not bring his wife to the hospital immediately after the alleged attempt, and instead sought medical intervention two days later, on May 6, 2008.  See Ayanna Depo at 85. After an overnight hospitalization in a German facility, Ms. Ayanna left the hospital of her own accord. Id. at 86.

13.      On May 9, 2008, Ayanna sent an e-mail to Angelo Lercara and Maria Frediani, attorneys in the Dechert Munich Office, and stated that his wife was ill due to complications with her pregnancy.  See Ayanna Depo. at 89-92; Depo. Exhibit 6.  In that e-mail, Ayanna requested permission to work from home.  See Ayanna Depo. at 92;  Depo. Ex. 6.  Dechert granted him permission to do so.  See Ayanna Depo. at 89-94; Depo. Ex. 7; Mehr Declaration ¶ 11.

14.      On May 26, 2008, Ayanna e-mailed Mr. Lercara and several other Dechert attorneys, stating:

> "Since I spoke with Angelo [Lercara] last week, it has become clear that it would be difficult for me to maintain a full workload with my wife in her present condition.  I believe the necessary course is for me to take an emergency FMLA leave of 12 weeks.  The Munich Office has a letter from my wife's doctors (in German) explaining her condition and her need of my constant care.  Following the 12-week FMLA leave, I plan to take 4 weeks of paternal leave and return to the Boston office around mid-September.  From there, I have no doubt that I will be able to resume a full schedule.  I apologize for my sudden departure from the Munich office due to a family emergency, but I believe the 8-month experience was very valuable for me, and of course I hope to continue to assist with international and German-specific work as I continue my career at Dechert.  It won't be a problem for me to resolve any matters I am presently working on."

See Ayanna Depo. at 96; Mehr Declaration ¶ 12, Exhibit A.

15.      Dechert approved Ayanna's request to take FMLA leave.  See Mehr Declaration ¶ 13.

16.     Ayanna's FMLA leave commenced on May 27, 2008 and was initially scheduled to last twelve weeks, after which Ayanna intended to take four weeks of paid parental leave under Dechert's parental leave policy.  See Ayanna Depo. at 95-96; Mehr Declaration ¶ 13, 15.

17.     Ayanna returned to the United States from Germany in June 2008.  See Ayanna Depo. at 107-108.

18.     Ayanna took FMLA leave from May 27, 2008 through July 20, 2008.  See Ayanna Depo. at 110, 127; Mehr Declaration ¶ 13.  Dechert does not advance vacation time to employees.  See Mehr Declaration ¶ 10.

19.     Ayanna's second child was born on July 7, 2008.  See Ayanna Depo. at 123.

20.     On July 21, 2008, Ayanna sent an e-mail to Joseph Fleming, John O'Hanlon, Mari Rose and Mary Mehr stating as follows:

> "[S]ince the baby has been born my wife has been recovering faster than expected and no longer requires me to stay at home to care for her.  That being the case, I would like to take my four weeks paternal leave starting today and return to work August 18th (4 weeks earlier than planned).  Is everyone amenable to this plan?"  See Ayanna Depo. at 125–126; Mehr Declaration ¶ 14, Exhibit B.

21.     On July 21, 2008 email, O'Hanlon sent an e-mail to Ayanna stating: "Congratulations, Ariel!  Boy or girl?"  See Mehr Declaration ¶ 14, Exhibit B; Ayanna Depo. at 127 – 128.

22.     On July 21, 2008, Kevin Bopp, a senior associate at Dechert, sent an e-mail to Ayanna stating "I'm uncertain as to whether you are receiving e-mails.  How is your wife feeling?  I hope all is going well."  See Ayanna Depo. at 128–129, Depo. Exhibit 15.

23.     Ayanna took leave pursuant to Dechert's paid child care leave policy from July 21, 2008 through August 17, 2008.  See Mehr Declaration ¶ 15; Ayanna Depo. at 126-127.

**D.     Ayanna Returns to Work at Dechert's Boston Office.**

24.     In early August 2008, Ms. Mehr began the process of re-assigning Ayanna to client teams and lining up various work assignments for him.  <u>See</u> Mehr Declaration at ¶ 16.  At that time, one of Dechert's Boston-based FSG partners, Christopher Christian, had a rapidly growing caseload with an immediate need for associate support.  <u>See</u> Deposition of Christopher D. Christian, November 15, 2011 ("Christian Depo.") at 138–146; Ayanna Depo. at 147.

25.     Although Mr. Christian had been dissatisfied with a project that Ayanna had worked on for him in the Spring of 2008 (while Ayanna was working from Germany), he agreed to provide some new assignments to Ayanna.  <u>See</u> Christian Depo. at 142-143.  Accordingly, Ms. Mehr informed Ayanna that, upon his return to the Boston office, he should contact Mr. Christian for new work assignments.  <u>See</u> Ayanna Depo. at 147.

26.     During the Fall of 2008, Mr. Christian did not know that Ayanna had taken any FMLA leave.  <u>See</u> Christian Depo. at 70.

27.     Mr. Christian and his wife, who was then working as a full time attorney, had also had a child during the Summer of 2008, after which Mr. Christian had taken three weeks off. <u>See</u> Christian Depo. at 118.

28.     Thomas Gierath, a National Partner in Dechert's Munich office, took seven vacation days after the birth of one of his children and eight days after the birth of his other child. <u>See</u> Exhibit 8 (Responses to Court Order dated January 18, 2012).

29.     Three male attorneys took 12 weeks of FMLA leave during Ayanna's employment at Dechert.  <u>See</u> Mehr Declaration. ¶ 18.

30.     Between September 2006 and December 2008, 36 male attorneys at Dechert took four weeks of paid child care leave.  <u>See</u> Mehr Declaration. ¶ 19.

31.     On August 18, 2008, Ayanna's first day back at work after his leaves, Ayanna

met with Mr. Christian to discuss work assignments.  Ayanna Depo. at 154-155.  Ayanna

contends that, during this meeting, Mr. Christian stated that Ayanna looked "tired."  See Ayanna

Depo. at p. 154.

32.     On August 18, 2008, after his meeting with Mr. Christian, Ayanna wrote an e-

mail to his wife stating that that "working for Chris sucks."  See Ayanna Depo. at 152-153;

Depo. Ex. 19.

33.     On August 26, 2008, Ms. Mehr sent an e-mail to Mr. Christian, with a copy to Mr.

Fleming, stating: "Joe is interested in making sure Ariel is getting off to a good start.  For the

assignments that Ariel is doing for you, is he meeting the standards we set and delivering the

work product in a timely manner?"  Id.; Christian Depo. at 150–151.  Mr. Christian responded

that "I have [had] several talks with Ariel about the quality of his work product and being more

responsible last week."  See Mehr Declaration ¶ 17, Exhibit C.

34.     Ayanna testified that fellow associate, Julien Bourgeois "bragged" that while his

wife was sick in the hospital he took work-related phone calls, worked from her hospital room

and returned to the office while she was still in the hospital.  See  Ayanna Depo at 26-27.

However, Ayanna was unable to recall the date, time, location of these comments.  Id.  Ayanna

also could not identify who else was present to hear these or any other comments made by Mr.

Bourgeois regarding his family life.  See Ayanna Depo. at 29-32.

35.     Ayanna testified that fellow associate Tom Bogle "bragged" that Dechert paid for

Bogle's wife to fly to New Orleans to visit family, allowing him to spend more time at the office

and not make demands on his time.  See Ayanna Depo. at 33-35.  However, Ayanna was unable

to recall the date, time, location of these comments.  Id.  Ayanna also could not identify who else

was present to hear these or any other comments made by to recall the date, time, location or who else was present during any other comments made by Mr. Bogle regarding his family life. <u>See</u> Ayanna Depo. at 36-37.

36.      Between August 2008 and November 2008, Ayanna periodically missed deadlines for Mr. Christian, was unavailable when sought for new projects and turned in several low-quality assignments.  <u>See</u> Christian Depo. at 152-177, 181-187, 190.  On at least one occasion, Ayanna's work product for Mr. Christian was so poor that the time Ayanna spent researching and writing could not be billed to the client.  <u>See</u> Christian Depo. at 165-173.  Unable to use most of what Ayanna had completed, Mr. Christian had to take over the assignment himself at the last minute.  <u>Id.</u>

37.      Throughout the Fall of 2008,  Mr. Christian regularly apprised Ms. Mehr and Mr. Fleming about his growing dissatisfaction with Ayanna's inability to provide clients with the required level of service.  <u>See</u> Christian Depo. at 152-178.

38.      During the Fall of 2008, after Ayanna had missed several deadlines and produced poor work, Mr. Christian met with Mr. Fleming to discuss Ayanna's performance.  <u>See</u> Christian Depo. at 181–182, 186.  Mr. Fleming instructed Mr. Christian to speak with Ms. Mehr to ensure that all projects were properly staffed but asked Mr. Christian to continue working with Ayanna to help him improve.  <u>See</u> Christian Depo. at 158, 181-182.

39.      Consistent with Mr. Fleming's instructions, Mr. Christian continued to provide Ayanna with work during the Fall of 2008.  <u>See</u> Christian Depo. at 188-190; Depo. Ex. 36.  Mr. Christian remained concerned about Ayanna's reliability due to Ayanna's continued habit of missing deadlines and providing low-quality work product.  <u>See</u> Christian Depo. at 189; <u>See</u> Deposition of John O'Hanlon, October 27, 2011 ("O'Hanlon Depo.")  at 127.

40.     On October 1, 2008, Ayanna sent an e-mail to Mr. Christian stating, "Chris, I'm working on the [REDACTED] materials now.  I couldn't get much done last night since I had to take my suicidal wife to the hospital.  The situation is under control and I will be able to put all hours required going forward to get back up to speed."  <u>See</u> Christian Depo. at 201–207; Depo. Ex. 56.

41.     Upon receiving this email, Mr. Christian sent an email to Ayanna stating "Ariel: Sorry to hear that.  If you need some time to get things at home settled, just let me know."  <u>See</u> Christian Depo. at 201–207; Depo. Ex. 56.  Ayanna responded by sending an e-mail that stated: "Thanks, I've already taken too much time off this year and I think the best thing is to work.  I don't like to use personal issues as excuses, but I did want you to know there are extenuating circumstances involved.  I don't expect it will impact my work volume or quality going forward. I'll stop by with my progress on ongoing matters when I have them prepared."  <u>See</u> Christian Depo. at 201-207; Depo. Ex. 56.

42.     On or about October 1, 2009, Mr. Christian alerted Ms. Mehr and Mr. Fleming to Ayanna's communication regarding his "suicidal wife."  <u>See</u> Christian Depo. at 201–207.

43.     When Mr. Ayanna returned to the office, Mr. Christian met with Ayanna and suggested that he take as much time as he needed to ensure his wife was cared for.  <u>See</u> Christian Depo. at 206.  During this meeting, Mr. Ayanna stated that things at home were settled and that it would not affect his work.  <u>See</u> Christian Depo. at 206.

44.      In October 2008, Ayanna also spoke with Mr. Fleming about his wife's apparent difficulties.  <u>See</u> Deposition of Joseph R. Fleming, October 28, 2011 ("Fleming Depo.") at 134-135; Ayanna Depo. at 167 -168, 175.  Mr. Fleming reminded Mr. Ayanna of Dechert's part-time policy.  <u>See</u> Ayanna Depo. at 167–168; Fleming Depo. at 138-146, 169-172.

45.     During the period of Mr. Ayanna's employment, Dechert had a part-time work policy, which provided as follows:

> The Firm will support lawyers who desire to combine their legal work with responsibilities as providers of care to their children, their parents, or their spouses or life partners.  Any lawyer (associate, counsel or partner) who wishes to work on a part-time basis (60% or more of full-time) in order to act as a care-giver may do so without obtaining the Firm's approval.

See Mehr Declaration ¶ 27 & Exhibit F.

46.     Ayanna did not request to work on a part-time basis.  See Ayanna Depo. at 167 - 168.

47.     Ayanna told Mr. Fleming that he did not want to work part-time, in part, because working part-time would have caused a corresponding decrease in salary.  See Fleming Depo. at 169 -172.

48.     On October 20, 2008 at 7:40 p.m., Ayanna sent an e-mail to Mr. Christian stating: "In order to avoid future issues, I would like to propose the following.  I like to bring my 5-year old to school in the mornings because he is already asleep by the time I get home 90% of the time.  If I'm diligent about when we leave the house, I can still get into work between 9 and 9:15.  If you specifically request I come in early or if I have an early call, I will come in earlier.  Other than infrequent, isolated events, I can stay as late in the evening as necessary, and I am available to work on the weekend.  Does this sound agreeable?"  See Ayanna Depo. at 164 – 165; Depo. Ex. 20.  On October 20, 2008 at 10:20 p.m, Mr. Christian responded to Ayanna by sending an e-mail stating "Yes it does."  See Ayanna Depo. at 164 – 165; Depo. Ex. 20.

49.     In the Fall of 2008, Mr. Christian established weekly mentoring meetings with Ayanna to review the requirements of assignments and set internal deadlines.  See Christian

Depo. at 160, 186 - 187.  In connection with those meetings, Mr. Christian asked Ayanna to keep a running list of all projects on which he was working.  See Christian Depo. at 186 -187.

     **E.**        **Ayanna Receives a "Fair" Review.**

50.       During Mr. Ayanna's tenure, Dechert had an established review process for evaluating its associates.  See Mehr Declaration ¶ 20.  Senior attorneys are asked to comment on associates with whom they have worked over the course of the previous year using a template system.  Id.; O'Hanlon Depo. at 75.   These reviews include comments regarding the associate's performance and a "rating" of the associate's performance in a number of categories.  Id.

51.       In late 2008, Ms. Mehr assisted Dechert's FSG human resources committee with its review of all Dechert FSG associates.  Mehr Declaration ¶ 21.

52.       In November 2008, in connection with the reviews of FSG associates, Ms. Mehr created a chart reflecting the billable hours of all FSG associates between January and October 2008.  Id. ¶ 22, Exhibit D.

53.       In November and December 2008, Dechert's FSG human resources committee reviewed the hours that each FSG associate had billed during 2008 as well as the evaluator comments for each of the U.S.-based FSG associates.  See O'Hanlon Depo. at 87-88; 132-133; Fleming Depo. at 19.

54.       At his deposition, Mr. Fleming testified: "[E]arning hours are viewed very much as a proxy for performance."  See Fleming Depo. at 23.   Mr. Fleming further testified: "Someone with lower earning hours generally is not in high demand within the practice group. And that can be an indicator of whether somebody is performing well within the practice."  See Fleming Depo. at 23.

55.      During his deposition, Mr. Fleming testified:  "We pay top salaries, at billing rates that are commensurate with the high salaries that we pay associates, and so the expectations - our client's expectations – are quite high for our delivery of service, and accordingly, we expect a lot from our associates."  See Fleming Depo. at 54.

56.      At his deposition, Mr. O'Hanlon testified:  "[P]art of the job of the HR Committee is to essentially take [the comments] and then look at the bigger picture, which includes productivity level, and it would be, you know, unusual, in my view, for someone with fairly low productivity to get above a "fair" because the—you know, essentially the definition of a 'good' assumes a certain level of productivity."  See O'Hanlon Depo. at 84–85, 114-117.

57.      During the course of Ayanna's 2008 review, no one at Dechert complained to the FSG human resources committee about Ayanna taking FMLA leave or child care leave.  See O'Hanlon Depo. at 200.

58.      During the course of Ayanna's 2008 review, no one at Dechert expressed any frustration to the FSG human resources committee about Ayanna being unavailable while he was on FMLA leave or child care leave.  See O'Hanlon Depo. at 200.

59.      From January 2008 through October 2008, Ayanna worked a total of 850 billable and 41 *pro bono* hours at Dechert.  See Mehr Declaration ¶ 21 at Exhibit D.  In order to account for his FMLA leave and his child care leave, however, his annualized billable hours for 2008 were adjusted upward to 1,460.  Id.

60.      Out of the sixty-five FSG associates who were working at Dechert in late 2008, Mr. Ayanna ranked sixty-second in annualized billable hours.  See Mehr Declaration at ¶ 24.

61.      In 2008, the five performance rankings used by Dechert were "Outstanding", "Very Good", "Good", "Fair" and "Poor."  Id.  A "Fair" ranking is defined by Dechert as "a

lawyer functioning capably but in need of improvement to achieve the of performance we expect of Dechert associates at his or her level of experience." <u>See</u> Mehr Declaration at ¶ 25.; O'Hanlon Depo. at 131.

62.     Mr. Christian's evaluation of Ayanna's "Written Expression" stated that "his work product is sloppy and shows a lack of attention to detail." <u>See</u> Mehr Declaration ¶ 21 at Exhibit D; Christian Depo. at 225.

63.     Mr. Christian's evaluation of Ayanna's "Professionalism" stated that he needed to work on "being more responsive to . . . clients internally and externally," and that he "needs to take on more responsibility" and "is bright and articulate but often lacks drive." <u>See</u> Mehr Declaration ¶ 21 at Exhibit D; Christian Depo. at 225.

64.     Senior associate Thomas Bogle's evaluation of Ayanna stated:  "Ariel sometimes conveys a lack of commitment to his work.  He has turned in work-product that reflected an 'I don't care' attitude and I have expressed my displeasure about it.  To his credit, however, Ariel has acknowledged when his work product does not meet expectation." <u>See</u> Mehr Declaration ¶ 21 at Exhibit D.

65.     Thomas Bogle's evaluation of Ayanna stated:  "[Ariel] has, on occasion 'passed the buck' to other members of his team, but also expresses a subsequent desire to act as a team player.  I think that Ariel needs to act in a manner that conveys to his colleagues that he consistently can be relied upon." <u>See</u> Mehr Declaration ¶ 21 at Exhibit D.  Additionally, Mr. Bogle's evaluation of Ayanna stated:  "I would trust Ayanna with routine matters – but not with a matter of significance." <u>See</u> Mehr Declaration at ¶ 21 at Exhibit D.

66.     Senior associate Megan Johnson's evaluation of Ayanna stated:  "on more than one occasion, he notified me at the last minute of his inability to complete an assigned disclosure

review." <u>See</u> Ayanna Depo. at 171; Mehr Declaration ¶ 21 at Exhibit D.  Ms. Johnson's evaluation of Ayanna further stated: "[Ayanna could] better communicate about the possibility of missed deadlines or work/non-work related conflicts." <u>See</u> Mehr Declaration ¶ 19 at Exhibit Depo. Ex. 21.

67.     Based upon his low billable hours and the commentary from Ayanna's various supervisors, the human resources committee assigned Ayanna a final overall rating of "Fair." <u>See</u> O'Hanlon Depo. at 84–87, 131, 140-141, 192-194.

68.     Ayanna's low billable hours were the predominant factor in making the determination that he receive a "Fair" ranking.  <u>See</u> O'Hanlon Depo. at 84–85; Fleming Depo. at 124–126.

69.     No Dechert associate in the FSG was given the ranking of "Poor" in 2008.  Mehr Declaration ¶ 26.  Thus, associates ranked "Fair" were the lowest ranked associates in the FSG in 2008.  <u>See</u> Mehr Declaration ¶ 26.

**F.       <u>Dechert Terminates Ayanna for Performance Reasons</u>.**

70.     In December 2008, Dechert terminated all but one of the "Fair"-ranked FSG associates.  <u>See</u> Mehr Declaration ¶ 28.  The terminations were effective on March 31, 2009. See Mehr Declaration ¶ 28.

71.     The only associate who was ranked "Fair" in 2008 but who was not terminated at that time had been hired by Dechert in June 2008, and was given additional time to improve.  <u>Id.</u> ¶ 28; O'Hanlon Depo. at 193.  That associate, however, was later terminated by Dechert in February 2009 along with other associates.  See Mehr Declaration ¶ 28.

72.     The six FSG associates terminated in December 2008 included three men and three women from various Dechert offices from around the United States.  <u>Id.</u> ¶ 27 Exhibit F.

73.     On December 17, 2008, Mr. O'Hanlon, Mr. Fleming and another Dechert partner, Geoff Kenyon, met with Ayanna to inform him that he had been terminated.  <u>See</u> O'Hanlon Depo. at 197; <u>See</u> Ayanna Depo. at 179 – 180, 185.

74.     During the December 17, 2008 meeting, Mr. Fleming informed Ayanna that his termination was not effective immediately.  <u>See</u> Ayanna Depo. at 184.  Fleming told Ayanna that the effective date of his termination would be March 31, 2009.  <u>See</u> Ayanna Depo. at 184.

75.     Ayanna left Dechert's offices on December 17, 2008 and returned only to collect his belongings and say good-bye to people.  <u>See</u> Ayanna Depo. at 184.

76.     Dechert paid Ayanna his full salary and benefits through March 31, 2009.  <u>See</u> Mehr Declaration ¶ 29; Ayanna Depo. at 184.

**G.     <u>Ayanna Expresses His Dissatisfaction with "Big Law" Hours.</u>**

77.     In December 2008 and early January 2009, Ayanna worked with a Boston-based legal placement recruiter, Stephen Seckler.  <u>See</u> Ayanna Depo. at 192 – 194.

78.      Ayanna completed a questionnaire to facilitate Mr. Seckler's employment search.  <u>See</u> Ayanna Depo. at 193; Depo. Ex. 24.  On the questionnaire Ayanna wrote: "I don't presently have aspirations to return to a firm."  <u>See</u>  Ayanna Depo. at 195-196; Depo. Ex. 24. Ayanna further wrote: "I want to work reasonable hours.  Big law hours are not sustainable for my family. This is a very important consideration for me."  <u>See</u>  Ayanna Depo. at 196–197. Depo. Ex. 24.

79.     On December 19, 2008, after his termination, Ayanna wrote an e-mail to a Dechert associate, stating, "It is rough, just because I'm not sure what I'll do now, but I can't say I liked the job much in the first place!  Chances are I'll end up somewhere other than a big firm!" <u>See</u> Ayanna Depo. at 188 -190; Depo. Ex. 23.

80.     After he was terminated by Dechert, Ayanna considered applying for a position

with the government because "one of the things that appealed to [him] about the possibility of

working for the government" was that "I would not be required to be in the office as much as I

was expected to be at Dechert."  See Ayanna Depo. at 187-188.

**H.     Dechert Discovers that Ayanna Routinely Violated its Expense Policies.**

81.     During the period of Mr. Ayanna's employment, Dechert had a formal policy

regarding meal allowances.  See Mehr Declaration ¶ 31.   That policy provided:  "If you work in

the office beyond 8:00 pm on a weekday or at least four (4) hours on a Saturday, Sunday or

holiday, you will be reimbursed for the cost of a meals provided that the amount is reasonable

and a receipt is provided.  Cost includes delivery charges and tips.  These expenses are

reimbursed in order to facilitate you working in the office beyond normal hours in connection

with client matters.  It is expected that meals will generally be delivered to the office or taken at

nearby restaurants where a quick meal can be obtained, and that work will continue for a

reasonable period after the meal."  See Mehr Declaration ¶31; Exhibit H.

82.     During the period of Mr. Ayanna's employment, Dechert had a formal policy

regarding taxi service reimbursement.  See Mehr Declaration ¶ 32, Exhibit I.   The policy stated

"[I]f [an attorney] is in the office beyond 8:00 p.m. on a weekday or at least four (4) hours on a

Saturday, Sunday or holiday, the attorney will be reimbursed for the cost of transportation [if]:

(1) your customary commuting service is not operating; (2) [your] customary commuting service

is on a schedule that causes significant inconvenience; or (3) the use of [your] customary

commuting service causes concern for personal safety."   Id.

83.     In early 2009, one of Dechert's clients contacted Mr. Christian and inquired about

certain meal expenses that had been charged to the client's account by Ayanna on a date when

Ayanna had performed and billed for less than an hour of work.  See Christian Depo. at 42–57.

In response to this inquiry, Mr. Christian reviewed the bills and invoices for the client and

determined that expenses were improper and were inconsistent with the firm's policies.  See

Christian Depo. at 42.  He accordingly wrote off the expense and credited the client's invoice.

Id.

84.     After this event, Mr. Christian became concerned that Ayanna's improper use of

expensing may have extended beyond that one client.  See Christian Depo. at 51.  Accordingly,

Mr. Christian contacted Ms. Mehr, who asked Administrative Assistant Kim Meikle to inventory

all taxi service and meal expenses charged by Ayanna to Mr. Christian's clients for the periods

during which Mr. Christian supervised Ayanna.  See Christian Depo. at 43; Mehr Declaration ¶

33.

85.     On April 13, 2009, Ms. Meikle forwarded a spreadsheet to Mr. Christian and Ms.

Mehr summarizing Ayanna's expenses during the period.  Mehr Declaration ¶ 34; Christian

Depo. 72.

86.     According to the spreadsheet provided by Ms. Mehr to Mr. Christian on April 13,

2009, Ayanna had billed twenty-two separate taxi fares and twenty-five different meals to Mr.

Christian's clients in less than three months.  See Christian Depo. at 42–57, 64-72; Mehr

Declaration at 34, Exhibit J.  Some of the meals had cost close to sixty dollars.  Id.  The

spreadsheet reflects that Mr. Ayanna had charged Mr. Christian's clients more than $1,600.00 for

such expenses in less than ninety days.  Id.

87.     After receiving this information from Ms. Mehr, Mr. Christian conveyed it to

Dechert's in-house General Counsel Arthur Newbold.  See Christian Depo. at 566 - 67.

88.      At the request of Mr. Newbold, Ms. Mehr created a spreadsheet summarizing Ayanna's expenses for all clients during the same period.  <u>See</u> Mehr Declaration ¶ 35.  The spreadsheet reflected that Ayanna had expensed thirty-nine different taxi charges and over thirty different meals to Dechert and various clients.  <u>See</u> Mehr Declaration at Exhibit K.  He did so even when there was public transportation available, and on days when he did little to no work for the client on the day of the charge.  <u>Id.</u>

89.      Mr. Ayanna's meal charges reflected meals that were consumed not only by him, but also by his wife and children.  <u>See</u> Ayanna Depo. at 212–223.

90.      At his deposition, Ayanna acknowledged that he had ordered meals for his family and charged the expenses to Dechert and its clients "more than occasionally" and perhaps as frequently as once or twice per week.  <u>See</u> Ayanna Depo. at 217-18.   At his deposition, Ayanna testified that he was aware of Dechert's meal allowance and taxi policies.  <u>See</u> Ayanna Depo. at 212–213.

91.      When asked at his deposition whether he thought it was acceptable for a client to pay for dinner for his family members, Ayanna testified that he "thought it wasn't important how much food, rather that the bill was reasonable" and that he "was trying to figure out an acceptable way for [his wife] to—you know, for her to have food."  <u>See</u> Ayanna Depo. at 221.

92.      On August 19, 2008, one day after returning to work after his leave, Mr. Ayanna sent an e-mail to his wife stating:  "I can try to coordinate dinner better and bring home something for you to share, though I am nervous about getting two courses since they have cracked down on costs somewhat.  I'll get one big thing and not eat too much."  <u>See</u> Ayanna Depo. at 218-219; Depo. Ex. 27.

93.     Mr. Newbold was "appalled and horrified" by Ayanna's abuse of Dechert's meal and taxi policies.  <u>See</u> Deposition of Arthur Newbold, December 5, 2011 ("Newbold Depo.") at 43.  In his more than forty years at Dechert, he "had never run across anything similar." <u>See</u> Newbold Depo. at 43.

94.     Mr. Newbold testified that "in order to justify the time to actually [investigate an attorney's expenses], you would have to have a reason to think that the person was thoroughly dishonest.  If you had a reason to think that person was thoroughly dishonest, the person wouldn't be there for very long anyway."  <u>See</u> Newbold Depo. at 127-128.

95.     Had Ayanna been employed by Dechert at the time that his abuse of Dechert's meal and taxi policies was discovered, he would been immediately terminated.  <u>See</u> Newbold Depo. at 45.  At his deposition, Mr. Newbold testified that "I've never seen this happen before, but it wouldn't be a close question."  <u>See</u> Newbold Depo. at 45.


                              Respectfully submitted,


                              <u>/s/ Daniel J. Cloherty</u>
                              Daniel J. Cloherty (BBO No. 565772)
                              Serina Q. Barkley (BBO No. 660657)
                              Victoria L. Steinberg (BBO No. 666482)
                              COLLORA LLP
                              600 Atlantic Ave.
                              Boston, MA  02210-2211
                              (617-371-1000)
                              dcloherty@collorallp.com
                              sbarkley@collorallp.com
DATED:  May 14, 2012          vsteinberg@collorallp.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 14, 2012.

*/s/ Daniel J. Cloherty*_____