**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| ARIEL AYANNA,                                  ) | |
|             **Plaintiff**                              ) | |
|                                                          ) | **Civil Action No. 10-12155-NMG** |
|             v.                                           ) | |
|                                                          ) | |
| DECHERT LLP,                               ) | |
|             **Defendant**                            ) | |
| _____  ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

The Defendant, Dechert LLP ("Dechert"), asks this court to dismiss the Plaintiff, Ariel Ayanna's ("Ayanna"), case by ignoring evidence of discrimination and retaliation; by drawing conclusions from the evidence that favor Dechert; and by crediting Dechert's witnesses and concluding that Ayanna's testimony is not credible. Ayanna has two claims: sex discrimination based upon stereotyping and retaliation for taking leave under the Family and Medical Leave Act ("FMLA"). Ayanna had a good start to his career at Dechert—receiving a $30,000.00 bonus after his first year. During his second year, Ayanna took eighty-four days of leave to care for his children and wife after she attempted suicide, far more leave for child care than the majority of male associates at Dechert during the preceding two years. He was terminated at the end of his second year, four months after having taken FMLA leave. During those four months, the attorney with whom he did the most work treated Ayanna antagonistically because he had taken FMLA leave and because of his caretaking responsibilities. In terminating him, Dechert claimed that he had "personal issues". Thus, the heart of this case is whether Dechert discriminated against Ayanna because he is a caregiver--not the stereotypical male breadwinner--and whether Dechert retaliated against him for having taken FMLA leave. As Dechert's General Counsel, Arthur Newbold, who has been a partner at Dechert for almost forty years, testified at deposition:

> Q. Are you aware that there's a stereotype that women are the primary
> caregivers for their children?
> **A. I think that's probably a fair generalization.**
> Q. Do you think that that stereotype is prevalent at Dechert?
> *A. I think that it probably is. I think most  people think that on the whole,*
> *women end up being the primary caregivers, rightly or wrongly.*

The U.S. Supreme Court has been clear in that these sorts of gender stereotypes are the exact reason for the passage of the FMLA:  "Stereotypes about women's domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men. Because employers continued to regard the family as the woman's domain, they often denied men similar accommodations or discouraged them from taking leave. . . . . [T]he FMLA is narrowly targeted at the fault line between work and family—precisely where sex-based overgeneralization has been and remains strongest..." *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 736-738 (2003).  A review of all the evidence, drawing conclusions and inferences in Ayanna's favor, as required by Rule 56, shows disputes of fact over the two material issues:  the motivation for Ayanna's termination and the veracity of the reason Dechert claims it terminated Ayanna.  To allow Dechert's motion would violate Rule 56.  Thus, this Court should deny Dechert's motion.

## ARGUMENT

### A.      SUMMARY JUDGMENT WHEN STATE OF MIND AND THE TRUTHFULNESS OF DECHERT'S REASON FOR TERMINATING AYANNA ARE AT ISSUE

Rule 56 provides that to prevail at summary judgment, Dechert must show "that there is *no genuine dispute* as to any material fact." F. R. C. P. Rule 56. [emphasis added]  As with all discrimination and retaliation claims, Ayanna's case turns on two issues: proof that Dechert harbored a discriminatory state of mind and proof that Dechert's explanation for its actions was a pretext (i.e. Dechert has not been truthful about why it terminated Ayanna).  In considering the evidence, the court is to view the record, as a *whole*, in the light most favorable to the plaintiff, the non-moving party, and it must "disregard all evidence favorable to the moving party that the jury is not required

2

to believe." *Santiago-Ramos v. Centennial Puerto Rico Wireless Co.*, 217 F.3d 46, 50 (1st Cir. 2000); *Anderson v. Potter*, 2010 U.S. Dist. LEXIS 70808, No. 08-12075, *8 (D. Mass. July 13, 2010). Ayanna receives the benefit of all favorable inferences from the Court. *Pederson v. Time, Inc.*, 404 Mass. 14, 17 (1989). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos*, 217 F.3d 46, 50. The question, then, is whether all the evidence, taken in the light most favorable to Ayanna, shows a genuine dispute about Dechert's state of mind and about the veracity of its reason for terminating Ayanna.

### 1. The Court must review all the evidence, not selected parts.

Rather than present all the evidence, integrating Ayanna's and its own into a coherent theory that might justify taking the case from a jury, Dechert has set forth only selected evidence, ignoring Ayanna's evidence of pretext, discrimination, and retaliation. For example, in paragraphs 27 through 30, Dechert describes the leave Christian took, the leave Thomas Gierath took, that three males took FMLA leave, and that thirty-six males took child care leave. Dechert omits that Ayanna took *eighty-four days* of leave—significantly more than Christian, Gierath, and the other thirty-six men who took child care leave. Men who took FMLA leave, a leave of length equivalent to Ayanna, are in the distinct minority: four (including Ayanna) out of fifty-nine. **SAF, ¶¶ 111, 115.** Ayanna claims that because he did not take on the stereotypical role of husband as breadwinner rather than caregiver, particularly in taking a leave the length of which *surpassed* the leave most men took, Dechert discriminated against him and retaliated against him for taking such a long leave. Viewing the evidence as a whole, a jury could infer from these specific facts that Dechert's culture only condoned men who acted as breadwinners, and did not take long childcare leaves, from this evidence. Ignoring

evidence from which a jury could infer discrimination does not support granting summary judgment. *See e.g., Chedid v. Children's Hospital et al.*, 2011 WL 2477235 (Mass.Super.).

### 2.   The court cannot make credibility determinations at summary judgment

To demonstrate a *lack* of dispute about material facts, Dechert's motion heavily relies upon crediting the testimony of its agents and determining that Ayanna's testimony is not credible. Specifically, Dechert sets forth the testimony of its agents on key points quotes or paraphrases testimony of its agents, such as Christian's denial that he knew of Ayanna's FMLA leave, as "undisputed facts" in these paragraphs: 25, 26, 34, 35, 36, 38, 39, 47, 49, 54, 56, 58, 62- 65, 66, 67, 84, 93-95. <u>See</u> Ayanna's Response to Dechert's Statement of Undisputed Facts.  The assumption in Dechert's argument is that Dechert's agents must be credited.   But this, the Court cannot do without violating Rule 56.  Credibility determinations should not be made in favor of the party seeking summary judgment because all inferences must be made in favor of the non-moving party. *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir.1995); *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 809 (1991).  It is worth repeating that the Court's purpose on summary judgment "is issue *finding*, not issue *determination*."  *Lee v. Trustees of Dartmouth College et al.*, 958 F.Supp. 37, 39 (D.N.H., 1997)(emphasis added).  The Court at summary judgment "***has no role at all in deciding whether such evidence is "plausible" or whether to "believe" it***."  *Anderson*, 2010 U.S. Dist. LEXIS 70808, at *10-11.

### 3.   All inferences must be drawn in Ayanna's favor

As explained above, Ayanna must prove his case through circumstantial evidence—i.e. through inferences in his favor.  Therefore, the requirement to draw all inferences in Ayanna's favor has particular force.  Dechert's Statement of Undisputed Facts invites the Court draw the following inferences in its favor: 9, 12, 21, 22, 26-30, 31, 32, 41, 43, 44-47, 48, 50-53, 59, 70-76, 78-80, 81-92. These paragraphs do not draw inferences in Ayanna's favor as required by Rule 56.  *Pederson v.*

*Time, Inc.*, 404 Mass. 14, 17 (1989); *Santiago-Ramos*, 217 F.3d 46, 50; *Anderson v. Potter*, 2010 U.S. Dist. LEXIS 70808, No. 08-12075, *8 (D. Mass. July 13, 2010) *citing Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).  The Court cannot draw the inferences Dechert invites it to draw without violating Rule 56.

**B.      AYANNA HAS MET HIS *PRIMA FACIE* CASE FOR BOTH HIS DISCRIMINATION AND RETALIATION CLAIMS.**

The showing to establish the second prong of the *prima facie* case, that the plaintiff was performing satisfactorily, is minimal.[1]  A plaintiff need only show that he met the minimum standards of performance, and not that he was better than other employees.  An employer cannot claim the employee has failed to show evidence on this element by claiming the plaintiff failed to satisfy subjective qualifications.[2]  Moreover, a showing of satisfactory performance at this stage of the framework does not consider the nondiscriminatory reason proffered by the defendant.[3]  Similarly, negative performance evaluations may not preclude a finding of satisfactory performance, particularly if there is some evidence that the negative evaluations were motivated by discrimination.[4]

---

[1] *See, e.g., Diaz-Figueroa v. Ricoh Puerto Rico, Inc.*, 2009 U.S. Dist. LEXIS 93828 (D.P.R. 2009) (summary judgment inappropriate where pregnant salesperson failed to meet quota; reasons aside from performance can affect achievement, and evidence was not so one-sided as to permit finding she did not perform satisfactorily).

[2] *Lambert v. Travel Centers of America*, 2009 U.S. Dist. LEXIS 106404 (D. Colo. 2009) (where pregnant employee had performance issues relating to customer service, she nevertheless made the minimal showing required by McDonnell-Douglas where she testified that she met the minimal qualifications for the position), *citing Burrus v. United Tele. Co. of Kansas*, 683 F.2d 339, 341-42 (10th Cir. 1982).

[3] *Kulik v. Medical Imaging Resources, Inc.*, 2009 WL 1139555 (6th Cir. 2009) (district court should not have considered employer's nondiscriminatory reason for terminating plaintiff when determining whether she had made out a prima facie case, which conflated the stages of the McDonnell Douglas test; rather, court should have considered her objective qualifications such as education and experience); *Fulkerson v. Amerititle, Inc.*, 64 Fed. Appx. 63; 2003 U.S. App. LEXIS 7955 (9th Cir. 2003); *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184 (10th Cir. 2000).

[4] *See, e.g., Gerving v. Opbiz, LLC*, 106 Fair Empl. Prac. Cas. (BNA) 221  (9th Cir. 2009) (negative evaluations did not preclude finding of satisfactory performance where there was some evidence they were motivated by discrimination).

**C.    SUMMARY JUDGMENT IS INAPPROPRIATE FOR AYANNA'S DISPARATE TREATMENT SEX DISCRIMINATION CLAIM BECAUSE A JURY COULD DECIDE DECHERT TERMINATED AYANNA BASED UPON ILLEGAL SEX STEREOTYPES.**

Making inferences in Ayanna's favor, the evidence demonstrates that Dechert maintains a culture that disapproves of men who take on a caregiving role.  Men who are caregivers--rather than the stereotypical breadwinner who does not take on caregiving--suffer negative career consequences, including termination.  **SAF, ¶¶ 117, 118, 124, 125, 127, 175.**  Enforcing sex-based roles for employees, such as by taking punitive action against a male employee because of a belief that he should leave caregiving to his wife, is sex discrimination by engaging in prescriptive gender stereotyping.[5] It violates M.G.L. c. 151B, § 4.

1. **Taking an adverse action towards male employees who take on a caregiving role is illegal gender stereotyping.**

The Supreme Court first explained that gender stereotyping is sex discrimination in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (1989).  The Massachusetts Supreme Judicial Court adopted this interpretation of sex discrimination in *Lipchitz v. Raytheon*, 434 Mass. 503 n. 16 ("[e]mployment decisions that are made *because of* stereotypical thinking about a protected characteristic or members of a protected class, whether conscious or unconscious, are actionable under G.L. c. 151B.").  The use of stereotypes can occur at any point in the employment relationship (at hire, in performance evaluation, or at termination), and employers often act on stereotypes without conscious reflection.  Whether the use of stereotypes is reflexive or conscious, it is illegal.  *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 61 (1st Cir. 1999); *Lipchitz*, 434 Mass. 493, 503 n. 16 (2001).

The ban on gender stereotyping includes making assumptions about a woman's worth as an employee because she is a mother.   *Chadwick v. Wellpoint* 561 F.3d 38, 44 (1st Cir. 2009); *Back v. Hastings on Hudson*, 365 F.3d 107, 121- 123 (2nd Cir. 2004); *Sivieri v. Department of Transitional*

---

[5]        *See* Joan C. Williams and Consuela A. Pinto, *Family Responsibilities Discrimination: Don't Get Caught Off Guard,* 22 The Labor Lawyer 293, 296-97 (2007) (discussing prescriptive stereotyping).

*Assistance*, 2006 Mass. Super. LEXIS 297, No. 02-2233, (June 22, 2006) (*quoting Back*, 365 F.3d 107, 120).

Though the plaintiffs in gender stereotyping cases are often women, courts apply the prohibition on gender stereotyping with equal force when employers enforce sex-based roles or expectations on male employees. *Higgins v. New Balance Ath. Shoe, Inc*, 194 F.3d 252, 261 n. 4 (1st Cir. 1999); *Centola v. Potter*, 183 F. Supp. 2d 403, 409 (D. Mass. 2002); *Smith v. City of Salem*, 378 F.3d 566, 572-3 (6th Cir. 2004) As the Supreme Court recognized, there is a need to encourage men to take on traditional female caregiving roles to combat the stereotypes about women's roles in child care and in the family. *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 728 and 736-38 (2003). Therefore, it is also sex discrimination to discriminate against a male employee does not leave caregiving to his wife. *See Knussman v. Maryland*, 272 F.3d 625 (4th Cir. 2001) (male state trooper sued for sex discrimination when denied leave provided to primary caregivers because of his sex; supervisor allegedly told him "God made women to have babies").  If an employer believes that a male employee's role as a father should be as breadwinner, not caregiver, and the employer attempts to require compliance with that belief, either consciously or unconsciously, through criticism, negative performance reviews, denial of leave and other punitive measures, the employer engages in illegal sex discrimination.  Courts deny or reverse summary judgment when an employee has evidence that an adverse employment action occurred because of a gender stereotype about the proper role of a parent.  *Chadwick*, 561 F.3d 38, 47-48; Back, 365 F.3d 107, 123; *Sivieri*, 2006 Mass. Super. LEXIS 297, *6.  Like those Courts, this Court should deny summary judgment because the following evidence demonstrates that gender stereotyping is precisely what happened to Ayanna.

2. **Ayanna's evidence that Dechert gave him an unjustified evaluation and terminated him because he was not the sort of father condoned at Dechert.**

    i. **The most significant complaints came from Christian who was antagonistic towards Ayanna because of his status as a primary caregiver.**

Newbold, Dechert's General Counsel, who has been a partner at Dechert for almost forty years, when asked whether the stereotype that women are the primary caregivers for their children is prevalent at Dechert said:

> **A. *I think that it probably is. I think most people think that on the whole*, *women end up being the primary caregivers*, *rightly or wrongly*.**

**SAF, ¶¶ 123**. Despite Newbold's admission, Fleming, O'Hanlon, and Christian, the Dechert agents who Ayanna claims discriminated and retaliated against him, all admit that Dechert's motivation for terminating Ayanna is disputed.  **SAF, ¶¶ 187**

In addition, the timing of the complaints Christian made about Ayanna gives a jury a sufficient factual basis to infer gender stereotyping.  Ayanna had been a primary caretaker during his first year at Dechert, advocating for the firm to implement policies that were friendlier to caregivers. He had deadline driven work and met his deadlines.  **SAF, ¶¶ 129-130.**  O'Hanlon, for whom he worked over 700 hours, did not complain about his unreliability.  See **Exhibit 8.**   Bopp, for whom he worked 302.3 hours thought so highly of him that he wrote him a glowing recommendation for a clerkship after his termination.  **Exhibit 8 and 65.**  Dechert reviewed him well and awarded him a $30,000 bonus.  The firm acceded to his request to go to Munich and considered binding him to them for an additional year.  **SAF, ¶¶ 129, 136-137.** Ayanna's level of care for his family did not change during his second year, even after his wife's suicide attempt.  What changed his second year was that he took FMLA leave and began working closely with Christian.  Ayanna worked very little during his first year with Christian (only approximately 60 hours).  See **Exhibit 8.**  During his second year, he was designated as Christian's "right hand man".  Christian, who complained about Ayanna not meeting his deadlines and reliability, also complained about Ayanna's care-taking responsibilities throughout the fall of 2008:

- "I hope you're not planning to leave at 5:30 today for any familial obligations," whether or not Ayanna had family obligations or planned to leave.  **SAF, ¶¶ 174.**

- "I have a young child at home and I manage to work and travel and get things done, and you should be able to also."  **SAF, ¶¶ 175.**

Christian, a rising star in the FSG, has a wife who put his career over hers and gave up the law to be a primary caregiver.  He did not reduce the hours he worked to care for his children and took little time off because, "We're in a client service industry; there are certain trade-offs. And I think I'll leave it at that."  **SAF, ¶¶ 122.**   Words showing bias make the existence of a material fact, the motivation for Christian's evaluation of Ayanna, more probable or less probable.  *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1133-1134 (4th Cir. Md. 1988).  From his own domestic choices, and that he thinks his arrangement is one must be to succeed at Dechert, a jury could infer that "the trade off" is that men have to be breadwinners, not caregivers.  This provides a factual basis for a jury to infer that his complaints about Ayanna were because Ayanna made the wrong choice.

In addition to his words, Christian's actions after Ayanna's email about his wife being suicidal demonstrate gender stereotyping.  Ayanna's email sent a clear signal that Ayanna would necessarily have to be a caretaker—a status the jury could infer Christian finds unacceptable for males.  After receiving this unmistakable signal, Christian immediately took work from Ayanna and complained about his unreliability:

- Christian notified Fleming immediately, discussed Ayanna's email with him and with Mehr, and began to provide work to others, even though he acknowledged that Ayanna had more "intellectual horsepower" than the other associates.   **SAF, ¶¶ 170, 172,-173**

- He doubted Ayanna's ability to continue to do the work required because he would have to be a full time caretaker.  **SAF, ¶¶ 172.**

- About two weeks after receiving Ayanna's email, Christian became extremely upset because Ayanna arrived at the office shortly after 9:00 a.m. and loudly complained to Fleming about Ayanna's unreliability **SAF, ¶¶ 176.**

Christian also repeatedly complained to Fleming about Ayanna.  At the time of Ayanna's

termination, Fleming admitted to Ayanna that his "personal issues" was one cause of his termination.

  The personal issues were Ayanna's FMLA leave and his role as the primary caretaker of his wife

and children of which Fleming was aware. **SAF, ¶¶ 156, 181, 185.**   From these facts, a jury could

infer that after listening to Christian's complaints all fall and seeing Ayanna's email, Fleming

assumed that Ayanna could not do the work. Combined with Ayanna's evidence of pretext detailed

below, the consequences of Christian's animosity toward Ayanna's status as a male primary

caregiver is a factual issue to be determined at trial, not assumed away. *See e.g. Diaz v. Jiten Hotel*

*Management, Inc.*, 762 F. Supp. 2d 319, 329 (2011).

      **ii.  The context of the culture at Dechert condones and promotes gender stereotyping.**

      The culture at Dechert is important to any analysis of whether sex stereotyping was the

determinative factor in Ayanna's termination. Workplace culture dictates decisions made by

individual actors who will be adhering to the cultural norms when evaluating an employee. Evidence

of a discriminatory atmosphere, "may be considered along with any other evidence bearing on

motive in deciding whether a Title VII plaintiff has met her burden of showing that the defendants'

reasons are pretexts".  *Sweeney v. Board of Trustees*, 604 F.2d 106, 113 (1st Cir. 1979); *Santiago-*

*Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir. P.R. 2000).  A jury could infer

from evidence of the atmosphere that Dechert's agents acted in accordance with it. *Velazquez-Garcia*

*v. Horizon Lines of P.R., Inc.*, 473 F.3d 11, 18-19 (1st Cir. P.R. 2007) (*citing Santiago-Ramos*, 217

F.3d at 55 and *Cummings v. Standard Register Co.*, 265 F.3d 56, 63 (1st Cir. 2001).   The Dechert

culture rewards men who are breadwinner fathers, not primary caretakers.

- O'Hanlon's, wife is the primary caretaker of their children, a decision they made so that he "could have a career at Dechert".  He only took a week or two off to care for his children. **SAF, ¶¶ 119.**

- Two of the top and most senior male associates in Ayanna's group, Julien Bourgeois ("Bourgeois") and Tom Bogle ("Bogle"), bragged about how little time they spent on family obligations.  **SAF, ¶¶ 124**

- Bogle bragged that he spent more time in the office than any other attorney at Dechert.  **SAF, ¶¶ 124.**

- Bourgeois is known for billing lots of hours, working even from his sick wife's hospital room.  He also complained because his wife wanted him to spend more time with his family, and he had Dechert fly her out of town when he needed to work.  He and other male attorneys used sexist terms like "Princess" to refer to a Bourgeois' wife. Bourgeois called female attorneys' work product "inferior" to that of male attorneys. Dechert made him a partner the day Ayanna was terminated.  **SAF, ¶¶ 125,  Exhibit 67.**

- Bourgeois and Bogle publicly mocked Ayanna's supporting more family/work balance at Dechert.  **SAF, ¶¶ 124.**

- Neither Fleming, nor O'Hanlon, nor Christian could name one male who has taken advantage of the firm's part time policy.  They also could not name a single individual who had worked part time and become a partner. There has never been a part time partner in the FSG.  **SAF, ¶¶ 117.**

The above circumstantial evidence allows an inference that Dechert's culture rewards employees who adhere to traditional gender roles for fathers.  That the men bragged about spending little family time and no male has taken advantage of the part time policy illustrates that Dechert expects men not to be caregivers. The belittling of Bourgeois' caregiver wife by calling her "princess" shows that this traditionally female pursuit is held in little regard.  Bourgeois, who flew his wife out of town to remove any sort of caretaking as far from him as possible, is particularly illustrative.  That Dechert made him a partner in the same breath as terminating Ayanna sends a strong message about what it takes to be successful at Dechert.

Under Dechert's Child Care policy, women can take twelve weeks of paid leave, but men only four.  Dechert declined to offer more paid leave to men. **SAF, ¶¶ 109.**  Thus, Dechert created a system which *reinforces* stereotypical gender roles for the care of a family--exactly the situation the FMLA was written to avoid.  Dechert's reinforcement of the stereotypes is reflected in how much leave men take to care for their children.

- Of the forty-three attorneys at Dechert who took leave under Dechert's Child Care leave policy between 2006 and 2008, all are men.  The average number of days of leave taken by the men who took paternity leave is **26.5.**  Only 25%, remain employed at the firm. [6]  Of those that are still there, not one is a partner.  **SAF, ¶¶ 113, 115, 117.**

- Of the fifty-nine attorneys at Dechert who took leave under the FMLA between 2006 and 2008, 93%, are female and only **7%** were **male**.  SAF..  The average number of days of leave taken by the women who took FMLA leave is **85.8**.[7] **SAF, ¶111, 115.**

Ayanna's leave of 84 days, an amount far beyond the average male total of 26.5, makes him an outlier among men at Dechert.  **SAF, ¶¶ 113-114.**  Where he was terminated after Christian's four months of antagonism because he is a primary caregiver and told the termination was because of his "personal issues", a jury has an adequate factual basis to infer that Ayanna's termination was because of sex stereotyping.

## D.     A JURY COULD INFER FROM AYANNA'S EVIDENCE THAT DECHERT'S REASONS FOR TERMINATING HIM ARE PRETEXTS

A jury could find that Dechert's proffered reasons for terminating his employment – low billable hours and poor skills – were pretexts for its discriminatory and retaliatory motives by crediting the circumstantial evidence set forth below.

### 1.     Ayanna's billable hours

- Lercara, a Dechert agent, assured the partners in Boston that Ayanna would be "fully occupied" when in Munich, and Munich attorneys bill fewer hours than attorneys in the United States; **SAF, ¶¶ 138, 149.**

- Two Dechert agents, Helm and O'Hanlon, explicitly told Ayanna that he should not worry about billing fewer hours in Munich.  Mehr reassured Ayanna that he should expect a "three month ramp up" period, particularly September and October, during which he was expected to bill fewer hours and that she would continue to look for work; **SAF, ¶¶ 146,149-150.**

---

[6]        80% of the women who took FMLA leave no longer work at Dechert, and none of the women are partners.

[7]        Dechert did not provide information as to whether the FMLA leave was for self care or the birth/adoption of a child.  As no women took leave under the Child Care policy exclusively, and because women could be paid for twelve weeks of leave, Ayanna assumes that most of the women who took FMLA leave took it for the birth/adoption of a child. Of the three men who took FMLA leave in addition to Ayanna, at least one, David Stec, took FMLA leave for self care, not for the birth or adoption of a child. Mr. Stec died on March 15, 2008 and is not survived by a wife or children.

- Ayanna continuously solicited work while in Munich from both the practice administrator and from partners personally; **SAF, ¶¶146.**

- O'Hanlon, on whose matters Ayanna worked over 700 hours in his first year, took Ayanna off his team not because of dissatisfaction with Ayanna's work but because it was too cumbersome to work with Ayanna in Munich and he did not want to have to explain to his client why an associate in Munich was working on the matter; **SAF, ¶¶ 101,147.**

- While Ayanna's billable hours were lower than associates in the United States, he out-billed the other associate in the Munich; **SAF, ¶¶ 144-145, 148-149.**

- In evaluating the performance of its attorneys, Dechert's policy is not to focus on hours alone when determining how to reward its associates: "we do not want our associates working to a specific number of hours" and "hours are not the only way to measure intensity of effort, quality of performance, and level of responsibility". It rewarded associates who were "well below" the billable hours requirement with bonuses. **See Exhibit 61.**

- At no point in time did anyone from Dechert advise Ayanna to increase his billable hours or risk jeopardizing his job; **SAF, 182.**

- Other attorneys who were terminated when Ayanna was had not made their hours the year before, unlike Ayanna who did; **SAF, 188-193.**

- Other attorneys who were terminated received notice about their deficient hours before being terminated. In contrast, Ayanna's billable hours never became an issue until after he took FMLA leave to care for his suicidal wife and children; **SAF, 192.**

- Ayanna's non-earning hours during his second year were high and were spent on significant client development work; **SAF, ¶¶ 148.**

### 2. **Ayanna's Legal Skills**

- Ayanna's positive 2006 performance review called him "reliable and dependable;" **SAF 131-135.**

- Ayanna's $30,000.00 bonus after his first year; **SAF, ¶¶136.**

- The qualitative evaluations in his 2007 performance review mostly praise Ayanna (in which he was rated as "good" or "very good" in most categories); **SAF, ¶¶ 184.**

- No one at Dechert, even Christian, questioned his intellect or his core skills; **Exhibit 8, 42.**

- Christian told Ayanna that he was spreading his work to other associates because of Ayanna's unreliability even though Ayanna had superior "intellectual horsepower"; **SAF, ¶¶172.**

- Christian's vague testimony about the alleged deficiencies in Ayanna's work performance. Christian either could not or refused, at his lawyer's instruction, to explain any specifics were, why they were important, or what happened; **SAF, ¶ 177, 186.**

- None of Christian's complaints concern Ayanna's core skills. For example, the "sloppiness" involves his choice of fonts, indent, typo, and spacing problems – in essence, issues for a good secretary to fix, nothing that impacted the quality of his legal work; **SAF, ¶ 177, 186.**

- Christian's complaints are actually by-products of his own inefficiencies, disorganization, and inconsistent requirements.  Other Dechert attorneys experienced the same problems with Christian that Ayanna did; **SAF, ¶ 186.**

- Ayanna had deadline-driven work during his first year and he met all deadlines, internal or external; **SAF, ¶¶ 129, 185.**

- Christian was unable to give any specifics about the deadlines that were missed, and he continued to work with Ayanna.  Ayanna, on the other hand, specifically explains how Christian's allegations are pretext. **SAF, ¶ 177, 186.**

- Christian lost no clients because of Ayanna, and one communicated directly with Ayanna which is a sign of Ayanna's good skills; **Exhibit 40.** None of Christian's clients lost rights because of Ayanna's action or inaction; **SAF, ¶ 177, 186.**

In questioning the veracity of Dechert's reasons for terminating Ayanna, the jury is entitled to consider the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." *City of Salem v. Massachusetts Comm'n Against Discrimination*, 44 Mass. App. Ct. 627, 642-643 (Mass. App. Ct. 1998) (citations omitted). The evidence set forth above is enough for a jury to find that blaming Ayanna for low billable hours is a pretext and that low billable hours were not a "proxy for poor performance".  Taking all inferences in Ayanna's favor, his low hours were a normal, and *expected,* result that Dechert both anticipated and told Ayanna not to worry about.

Dechert cannot avoid the qualitative praise for Ayanna's core skills during both years of his employment.  Nor can it avoid that it never raised a problem about billable hours until *after* Ayanna took FMLA leave to care for his suicidal wife and children after four months of antagonism from Christian.  While Christian has called Ayanna's work "sloppy", neither Ayanna's reviewers his first

year nor anyone he worked with in Germany thought so.  Ayanna has evidence that these complaints were particular to Christian and raised with other associates, not a general problem with his work product **SAF, ¶ 177, 186.**  Ayanna need not be the perfect employee to avoid summary judgment. *See e.g. Gerving v. Opbiz, LLC,* 324 Fed. Appx. 692, 694 (9th Cir. Nev. 2009) (evidence of both good and deficient performance necessitates a jury trial).

**E.     THERE IS SUFFICIENT EVIDENCE FOR A REASONABLE JURY TO CONCLUDE THAT AYANNA'S TERMINATION WAS MADE IN RETALIATION FOR HIS TAKING FMLA LEAVE.**

There are many facts from which jurors could conclude that Dechert retaliated against for Ayanna taking FMLA leave.  Dechert's claim that the facts do not support an inference of FMLA retaliation because Christian denies knowing about it has no merit. Christian's denial does not, as a matter of law, undermine the inferences a jury could draw.  The credibility of Christian's denial, as an agent of Dechert, is for the jury. Ayanna has presented circumstantial evidence that Christian knew.   First, Ayanna did not hide that he was taking FMLA leave and has testified that attorneys in the Boston office knew where other attorneys were, who was out, and why.  Fleming had told another associate about Ayanna's move to the Munich office before he had told anyone.  He admits that he disclosed Ayanna's wife's condition to O'Hanlon for no reason other than O'Hanlon was next door and he wanted to talk about it since the two talked often. **SAF, ¶ 170.**   Second, Christian and Fleming have a close professional relationship. Fleming is involved in Christian's professional development and they met weekly.  Christian has inherited business from Fleming.  The two talked frequently throughout the fall about Ayanna.  **SAF, ¶¶ 121-122, 170, 176-177.**  This evidence, if believed, is a *factual* basis for an inference that Fleming, who disclosed Ayanna's affairs to others who were not in the "need to know" circle, disclosed Ayanna's FMLA leave to Christian.   Such an inference would not be conjecture but would be based on a finding that Christian's denial is not credible, and credibility resolutions must be left to the jury.  *Lupia v. Marino*, 353 Mass. 749 (1967).

15

Determining Christian be conjecture but would be based on a finding that Christian's denial is not credible, and credibility resolutions must be left to the jury.  *Lupia v. Marino*, 353 Mass. 749 (1967). Determining Christian knew that Ayanna took FMLA leave gives the jury a basis to determine that his comments and actions, detailed below, relate to Ayanna's FMLA leave.

The timing of all Ayanna's performance deficiencies makes Dechert's actions suspicious.

Before going on FMLA leave:

- Ayanna never received a written or oral warning that his job was in jeopardy or that he needed to increase his billable hours; **SAF, ¶ 182.**

- He received a positive review received a $30,000.00 bonus at the end of his first year.  **SAF, ¶¶ 130-135;**

- Dechert valued him enough to accommodate his request to transfer to its German office for a year **SAF, ¶136** and considered binding him to stay for at least another year after he returned from Germany **Exhibit 11**.

Dechert's view of Ayanna and his treatment at the firm changed dramatically after he took

FMLA leave:

- Dechert started documenting alleged performance problems **8 days** after he returned from his FMLA leave;  **Exhibit 66.**

- After Ayanna returned from his FMLA leave, Christian insisted on knowing Ayanna's whereabouts at all times; **SAF, ¶164** although he had previously described Ayanna in his 2006 formal written performance evaluation as "dependable and reliable"; **SAF, ¶133.**

- Prior to taking FMLA leave, Ayanna would work from home and come in after 9:00 a.m. without incident.  **SAF, ¶104.**

- When Christian found out that Ayanna's wife was suicidal, he immediately doubted Ayanna's ability to continue to do the work required and was "very concerned" that Ayanna's saying the issue would not impede his work because he assumed caring for someone with mental illness would be full-time job.  He had a discussion with both Fleming and Mehr about Ayanna's email. **SAF, ¶¶ 169-70.**

- After taking FMLA leave, and after his wife had another episode that necessitated taking her to the hospital, Christian angrily complained to Fleming when Ayanna arrived shortly past 9:00 a.m., calling him "unreliable"; **SAF, ¶171; 172.**

- As a result, Fleming admonished Ayanna to arrive earlier because he knew who came in early and who did not; **SAF, ¶173; 178.**

- Prior to taking FMLA leave, Ayanna worked for over 700 hours for Mr. O'Hanlon, who was extremely pleased with his work and excited about his return to the Boston office. **SAF, ¶127.** Once he returned from FMLA leave, he was not reassigned to O'Hanlon's team and received little work from him. **SAF, ¶161, 173.**

- In his first year at Dechert, Ayanna worked 885 hours for Fleming. **SAF, ¶127.** After his return from FMLA leave, he received little work for Fleming's matters and only worked about 400 hours for Fleming during his second year. **SAF,¶161, 173.**

- Christian began to withhold work from Ayanna when he learned that Ayanna's wife required further care. **SAF, ¶169, 172.**

- Christian although he had Ayanna at his disposal, he dispersed his work to other associate attorneys who did not step outside of Dechert's "macho" culture and who did not take FMLA leave; **SAF, ¶ 172; Exhibit 3; Exhibit 36.**

The four months between Ayanna's return from FMLA leave on or about August 15, 2008 and his dismissal on December 18, 2008 in combination with the pattern of antagonism during these four months supports a *prima facie* case for retaliation. *See Mariani-Colon v. Dep't of Homeland Sec.*, 511 F.3d 216, 224 (1st Cir. P.R. 2007) (temporal proximity alone can "meet the relatively light burden of establishing a prima facie case of retaliation"); *see also DeCaire v. Muhasey*, 530 F.3d 1, 19 (1st Cir. 2008)(reversing finding that there was no temporal proximity where the protected activity and adverse action occurred "within a period of about one year".);*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3rd Cir. 2000)(evidence of causal link is "… not limited to timing and demonstrative proof, such as actual antagonistic conduct or animus… it can be other evidence gleaned from the record as a whole from which causation can be inferred.")  Combined with Ayanna's evidence of pretext, and Fleming's explanation that Ayanna was terminated because of his "personal issues." the temporal proximity provides a compelling factual basis for a jury to conclude that Dechert retaliated against him.

The evidence demonstrates that Dechert's reason for his termination is pretextual, as explained above. In addition to the evidence that Dechert's reason for terminating Ayanna is a pretext, a jury could infer that Dechert retaliates against associates who take leave for child care from the following evidence:

- ▪ ██████, another associate Dechert evaluated as "fair" and terminated, complained that she returned from maternity leave and the work was slow. See Notes of termination meeting, attached as **Exhibit 47.** ████ had not made her hours the year before. **Exhibit 54**.

- ▪ Ken Earley worried about taking more than a few days off to care for his children which caused Ayanna to worry about the length of time he took off. Near the time of the birth of his second child, after having applied for time off to care for his wife after the birth, he left Dechert, never taking the time off for which he applied. **SAF, ¶ 127.**

Therefore, a jury could infer that Dechert terminated Ayanna's employment in retaliation for his taking FMLA leave from the way the firm treated him after he returned after he returned and could find that the reasons given for his dismissal were a pretext, and summary judgment is inappropriate in this case. *Colburn v. Parker Hannifin/Portland Div.*, 429 F.3d 325, 337 (1st Cir. 2005).

**B.     DECHERT'S AFFIRMATIVE DEFENSE IS AN INAPPROPRIATE BASIS FOR SUMMARY JUDGMENT**

      1.   **Dechert failed to plead an affirmative defense based on after-acquired evidence defense and thus has waived it.**

Dechert failed to plead an after-acquired evidence affirmative defense in its Answer to Ayanna's Complaint and therefore waived it. *Red Deer v. Cherokee County, Iowa*, 183 F.R.D. 642, 652 (N.D. Ia. 1999). Dechert knew the facts underlying this defense almost two years before filing of its Answer. **SAF, ¶¶ 195-198.** Yet, in its Answer, Dechert, a law firm that is represented by sophisticated counsel, omitted an affirmative defense based on after-acquired evidence from its **sixteen** affirmative defenses. By failing to plead this affirmative defense, Dechert waived it. To hold

otherwise would contravene the Federal Rules of Civil Procedure and allow Dechert to engage in unfair play and surprise.

> 2. **Summary judgment cannot issue because Dechert can claim an affirmative defense based upon after-acquired evidence.**

Assuming that Dechert can pursue this affirmative defense, it is not entitled to summary judgment on liability. The after-acquired evidence is to determine the measure of *damages. Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 101 (1st Cir. 1997); *Palmquist v. Shinseki*, 729 F. Supp. 2d 425, 429 (D. Me. 2010). Even if this doctrine were about liability, *Dechert* has the burden to prove: (1) the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone; (2) if the employer had known of it at the time of the discharge. Id. The court must look to an employer's actual employment practices, not just standards articulated in its policies or employee manuals, and an employer must prove by a preponderance of evidence that it would have in fact terminated the employee for the alleged misconduct. Id. Where there are issues of material fact about whether the employer would have terminated him, those issues must be resolved by a jury. *Id.* at 430. Dechert cannot its burden because the facts detailed below show a dispute of material fact over whether Dechert would have investigated Ayanna's charges absent a retaliatory motive and whether Dechert would have terminated Ayanna on these grounds alone if it had investigated them.

- On December 29, 2008, Ayanna protested his termination as retaliation for having taken FMLA leave to Fleming, Helm, Christian, and O'Hanlon; **SAF, ¶ 195.**

- In early 2009, Christian asked Mehr to scrutinize Ayanna's charges for meals and taxis. He did not compare Ayanna's charges to those of other associates, although he has written off expenses of other associates in the past. Christian has never done a similar analysis on any other associate; **SAF, ¶¶ 196-198.**

- The expense policy at issue in this case is silent on the issue of employee discipline or termination; **Exhibit 68.**

- Dechert has never disciplined, investigated, or terminated any other attorney for expense policy abuses; **SAF, ¶ 196.**

- On March 16, 2009, Ayanna asserted claims against Dechert;  **SAF, ¶ 198; Exhibit 58**

- On April 13, 2009, Christian received an analysis he had requested of Ayanna's charges to clients. Christian sent the spreadsheet of Ayanna's expenses to Newbold, Dechert's General Counsel;  **SAF, ¶ 199.**

- On April 14, 2009, Dechert responded to Ayanna's demand letter, asserting a cause of action against Ayanna for his charges for meals and taxis based upon Christian's investigation; **SAF, ¶ 200.**

- On April 14, 2009, Dechert informed the Massachusetts Department of Unemployment Assistance that "the one reason that best reflects the status of this claimant" was "No Protest. **No misconduct or violation of company rules or policy.**" **SAF, ¶ 201.**

    The facts above create a substantial dispute over whether Dechert's defense was taken in retaliation for Ayanna's initial FMLA complaint and never would have occurred but for his complaint.  No one raised a problem with his expense charges until *after* he asserted legal claims against the firm.  There is no evidence of this sort of investigation with any other associate although he has written off other expenses, although presumably, other Dechert clients have complained about expense charges over the course of its 137 years in business. A jury could infer from the sequence of events that the investigation into Ayanna's expenses was motivated by his e-mail to the firm accusing them of violating his legal rights in selecting him for dismissal and his lawyer's demand letter.  Where there are issues of fact surrounding the after-acquired evidence, the court should not make determinations based on that evidence in preliminary proceedings.  *Dalton v. Wal-Mart Stores, Inc.*, 1996 U.S. Dist. Lexis 22786 at *7-8  (D.N.H. 1996) (denying a motion in limine to limit back pay damages when Walmart's ignorance of wrongdoing disputed).

    Furthermore, the evidence puts into question whether Dechert *would have* fired Ayanna if it had known about his expenses.  Dechert reported to a governmental agency that Ayanna did nothing wrong *same day* it sent a letter to Ayanna's attorney claiming a violation.  Seven months later, when defending against discrimination charges, Dechert still barely said word about this defense to

another governmental agency.  **Exhibit 63.** This is for a *factual* finding.  *Rinaldi v. CCX, Inc.*, 388

Fed. Appx. 290, 295 (4th Cir. 2010).   Newbold's outrage years later is not enough to carry the day.

Self-serving statements of an employer's agent that had he known of the misconduct, he would have

terminated the employee for cause are not enough to dispose of a claim before trial.  *Id.* at 296.

These contradictory reactions should be examined by a jury, not assumed away on summary

judgment.

Respectfully submitted
For the Plaintiff,
ARIEL AYANNA,
By his attorneys,

/s/ Rebecca G. Pontikes                      /s/ Lori A. Jodoin
Rebecca G. Pontikes, BBO # 637157        Lori A. Jodoin, BBO # 655840
PONTIKES LAW LLC                         ROGERS, POWERS & SCHWARTZ, LLP
77 Franklin Street, 3rd Floor            18 Tremont Street, Suite 500
Boston, MA 02110                         Boston, MA 02108
(617) 357-1888                           (617) 742-7010
rpontikes@pontikeslawllc.com             Lori@theemploymentlawyers.com

Dated: June 15, 2012

**CERTIFICATE OF SERVICE**

 I hereby certify that on June 15, 2012, this document filed through the CM-ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that to the extent necessary paper copies will be sent to those indicated as non-registered participants on June 15, 2012.

/s/ Rebecca G. Pontikes